STATE of Missouri, Respondent,

v.

Gordon Phillip WINROD, Appellant.

No. 24205.

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 17, 2002.

Application for Transfer to Supreme Court
Denied
Feb. 4, 2002.

Application for Transfer Denied
March 19, 2002.

---

582

Thomas D. Carver, Springfield, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Asst. Atty. Gen., Jefferson City, for Respondent.

Before SHRUM, P.J., MONGOMERY, J., and BARNEY, C.J.

PER CURIAM.

A jury convicted Gordon Phillip Winrod (Defendant) of six counts of the class D felony of child abduction for knowingly retaining six of his grandchildren under the age of seventeen in Missouri for thirty or more days without the consent of their legal custodians. § 565.156(4).[1] The trial court sentenced Defendant to consecutive terms of five years' imprisonment on each of the convictions. This appeal followed.

Defendant does not challenge the sufficiency of the evidence in support of his convictions. We view the evidence presented at trial in the light most favorable to the verdict and recite the facts accordingly. *State v. Werner*, 9 S.W.3d 590, 593 (Mo. banc 2000).

Defendant's daughters, Quinta and Sharon, married brothers from North Dakota, Joel and Tim Leppert. Joel and Quinta's marriage produced five children. Tim and Sharon's marriage produced six children.

Defendant informed Sharon that he would no longer want anything to do with her if she continued to live in North Dakota with her husband and remained in con-

---

1. Statutory references are to RSMo 2000 un- less otherwise indicated.

tact with the Leppert family. Thereafter, the marriage deteriorated quickly. Tim returned home from work one day to find Sharon and the children gone. Sharon filed for divorce in Ozark County, Missouri. The divorce decree awarded Tim and Sharon joint custody of the children. Later, the decree was modified to award Tim sole custody with Sharon having no right to visitation.

Joel and Quinta's marriage also deteriorated. Joel filed for divorce and was granted custody of all of their children. Quinta, like her sister, was denied any visitation with the children. Subsequently, Quinta also moved to Missouri to live with Defendant.

Following their marital dissolutions and the denial of custody and visitation, Sharon and Quinta began to systematically take their children from their homes in North Dakota and move them to Defendant's house in Missouri. The first children were taken in September of 1994 when Tim Leppert was away from home. When Tim returned to the family home, four of his children, N.L., E.L., twelve-year-old D.L., and eight-year-old J.L., were missing.[2] Sharon had entered the home and taken the children. After hiding the children in North Dakota, Sharon eventually took them to Defendant's home in Ozark County, Missouri. A year later, Sharon took another of the children, five-year-old J.L., and also transported him to Missouri to live with Defendant.

In September of 1995, Quinta entered Joel's home and took two of their children, eight-year-old S.L. and four-year-old M.L. Three months later, Sharon and Joel's brother, Mark Leppert, took another of Joel and Quinta's children, five-year-old T.L., from a mall parking lot in North Dakota. All three of these children also were taken to Defendant's home.

Sharon, Quinta and Mark were all tried in North Dakota in connection with the takings of the children. They were each convicted of felonious restraint. Mark and Sharon were also convicted of aggravated assault in connection with the missing children. Quinta was convicted of burglary for her role in removing the children from Joel's home. Each was sentenced to a term in the North Dakota Department of Corrections (NDDC).

While Sharon, Quinta, and Mark were under the supervision of NDDC, Defendant filed an application to accept phone calls from each of the convicts at his home phone number in Missouri. In compliance with regulations, NDDC officials monitored the phone calls. Defendant was heard to ask Quinta and Sharon, "Would you like to talk to someone special?" At that point a child would pick up the phone and say, "Hi, Mama." The conversations would often end with the child saying, "Bye, Mama." The children on the phone referred to Mark as "Uncle Mark." The tapes of these calls were forwarded to the FBI agent in charge of the missing children's cases. The children's fathers, Tim and Joel Leppert, were able to positively identify the children's voices on the tapes.

The taped telephone conversations, along with letters and photographs, established that the missing children were living with Defendant at his farm in Missouri. Furthermore, "The Winrod Letter," in the June 2000 issue, established that the children had been left with Defendant by their mothers and they had resided with Defendant for the past four years.

---

**2.** Defendant was not charged with the kidnapping of N.L. or E.L., and they are not involved in this case.

Evidence showed that while the children lived on Defendant's property he taught them to hate their fathers and legal authorities. The children were taught to hide in the woods if anyone came on the property. In the event the house was surrounded, the children were to hide in an underground bunker.

In September of 1996, FBI agents arrived at Defendant's farm. Defendant informed the agents that he knew nothing about the children and asked the agents to leave his property. The children hid in the bunker until the agents left.

In May of 1997, an FBI agent and the Ozark County Sheriff went to Defendant's farm to discuss the children's whereabouts. Defendant ordered them off of his property. As the agent and the officer left, they noticed small footprints in the dust and gravel in front of Defendant's home. They also saw toys, bicycles and a sandbox.

Based upon evidence that the missing children were on Defendant's property, a search warrant for the property and an arrest warrant for Defendant were issued. On May 17, 2000, Defendant, his son Steven, and his daughter Carol were all arrested on the Defendant's property. The children barricaded themselves inside the house. Defendant informed officers of the Missouri Highway Patrol that the children would be better off dead than to leave the farm and be returned to their fathers.

Ultimately, the children were taken from the home and transported to the juvenile facility in Mountain Grove, Missouri. A search of the property turned up photos of the children taken on Defendant's farm dating back to 1997. Defendant was charged with six counts of the class D felony of child abduction.

After a jury trial on the matter, Defendant was convicted of all six counts of child abduction and sentenced to five years' imprisonment on each count with the sentences to be served consecutively. Defendant appeals.

Here, Defendant presents two primary allegations of trial court error. First, Defendant contends the trial court erred in denying his request for issuance of writs of habeas corpus to compel the attendance of out-of-state witnesses on his behalf. Defendant next complains that the trial court erred in failing to maintain a position of neutrality during the trial and in communicating the court's belief in Defendant's guilt to the jury.

We begin by addressing the numerous allegations of error presented under Defendant's Point I. Defendant first complains that the trial court abused its discretion in denying his request for the issuance of writs of habeas corpus to compel the attendance of several out-of-state witnesses. Defendant then maintains the trial court erred in failing to *sua sponte* compel the attendance of these witnesses under the provisions of the Uniform Law to Secure the Attendance of Witnesses from Within or Without a State in Criminal Proceedings, §§ 491.400 through 491.450 (Uniform Law). Finally, Defendant alleges the trial court erred by failing to take "steps to appoint counsel over Defendant Winrod's objection and [making] no attempt to take minimal steps to secure favorable testimony" for Defendant.[3] These contentions have no merit.

On December 28, 2000, Defendant filed a "Request" with the trial court that provided:

---

**3.** Defendant insisted upon representing himself at trial. Although Defendant acted pro se, the trial court appointed "standby" counsel to sit with Defendant at trial and answer his questions concerning "protocols and procedures."

Here is [a] request for Habeas Corpus Writs for trial defense witnesses: Mark Leppert, Quinta Leppert, Sharon Leppert, [D.L.], and [S.L.], all incarcerated in North Dakota, and are all necessary witnesses.

In addition, 25 subpoenas are requested for additional defense witnesses.

The trial court treated the document as a request for writs of habeas corpus ad testificandum and overruled Defendant's request.[4] The granting of such a writ falls within the trial court's discretion and should only be issued with strict proof of the materiality of the testimony and the necessity of the attendance of the prisoner as a witness. *Laws v. O'Brien,* 718 S.W.2d 615, 618 (Mo.App.1986).

The trial court suggested that if Defendant wanted those witnesses to testify, he must make arrangements, at his expense, to take their depositions prior to trial to establish the necessity of their live testimony. Defendant counters that the "Request" provided sufficient information to require the trial court to issue the writs. We disagree.

In a similar case, *State v. Nichols,* 781 S.W.2d 244, (Mo.App.1989), the defendant maintained the trial court erred in refusing to issue a writ of habeas corpus ad testificandum to compel the presence of a witness who was an inmate housed in Arkansas. This court disagreed, noting that " '[p]rocess issued out of the courts of the State of Missouri does not have extraterritorial power' " and the defendant had made no effort to obtain the presence of the witness through the proper process, specifically the Uniform Law. *Id.* at 245 (quoting *State v. Ivory,* 609 S.W.2d 217, 220 (Mo.App.1980)). This court also noted that the defendant failed to obtain the

deposition of the Arkansas witness pursuant to Rule 25.12. *Id.* The court concluded, "It was not the obligation of the trial court to produce witnesses for the defendant." *Id.*

The instant case is factually indistinguishable from *Nichols.* Defendant used improper means to secure the presence of his witnesses by failing to request the trial court to invoke its powers under the Uniform Law. Defendant requested a writ of habeas corpus and nothing more. The witnesses did not testify because of Defendant's error, not that of the trial court.

■■■ " '*Pro se* parties are bound by the same rules of procedure as parties represented by lawyers, and are not entitled to indulgences they would not have received if represented by counsel.' " *Murphy v. Shur,* 6 S.W.3d 207, 208 (Mo. App.1999) (quoting *Belisle v. City of Senath,* 974 S.W.2d 600, 601 (Mo.App.1998)). While this court acknowledges the problems faced by *pro se* litigants, we cannot relax our standards for non-lawyers. *Hardin v. State,* 51 S.W.3d 129, 131 (Mo.App. 2001).

■■ Defendant faults the trial court for not overlooking his mislabeled "Request" and failing to *sua sponte* compel the attendance of the out-of-state witnesses pursuant to the provisions of the Uniform Law. However, even if the trial court had deemed it appropriate to act *sua sponte* to aid Defendant in securing his witnesses pursuant to the Uniform Law, Defendant's "Request" presented insufficient evidence as to the materiality and necessity of such witnesses.

■■■ According to the requirements of the Uniform Law, the burden is on the

---

4. Such a writ is used to bring up a prisoner detained in a jail or prison to give evidence before the court.

party seeking the presence of the witness to establish that such testimony is material and necessary. *State v. Moore*, 882 S.W.2d 253, 268 (Mo.App.1994). The party should present evidence by affidavit of the witness or in some other way establish the materiality and necessity of the testimony. *Id.* "Even when a showing of materiality and necessity is made, the granting of the application is largely within the discretion of the trial court, for the statute provides the trial judge 'may' issue the certificate." *Id.* Accordingly, we cannot say the trial court erred in failing to *sua sponte* utilize its powers under the Uniform Law to secure Defendant's witnesses.

■ Finally, in Point I Defendant maintains the trial court erred in failing to appoint counsel over Defendant's numerous objections to the appointment of counsel. However, in the argument portion of his brief, Defendant makes no corresponding mention of this allegation. Claims of error presented without supporting argument preserve nothing for our review and are deemed abandoned. Rule 84.04(e); *Papineau v. Baier*, 901 S.W.2d 190, 192 (Mo.App.1995). Although Defendant's claim does not merit review, it should be noted that even a cursory perusal of the transcript indicates the trial court did indeed appoint an attorney to be Defendant's "standby counsel" and sit with Defendant at trial to answer any questions he might have during the proceedings. Point I is denied.

In his second point on appeal, Defendant maintains the trial court erred in failing to maintain a position of neutrality during the trial and in communicating its belief in Defendant's guilt to the jury. Specifically, Defendant complains he suffered prejudice when the trial court referred to the children as "the abducted children" and informed the jury the State had declined to produce the children to protect them from

further harm. Defendant also argues he was prejudiced because the trial court refused to allow evidence that the children had been abused prior to their takings, held him in contempt of court in the presence of the jury, and allowed the State to introduce evidence of Defendant's "controversial but irrelevant religious beliefs."

■ Defendant acknowledges he did not preserve these complaints in his motion for new trial and requests plain error review pursuant to Rule 30.20. Plain error review should be used sparingly and does not justify a review of every point that has not been properly preserved for our review. *State v. Cobbins*, 21 S.W.3d 876, 880 (Mo.App.2000). "Under the plain error standard of review, the error complained of must impact so substantially upon the rights of the defendant that manifest injustice or a miscarriage of justice would result if left uncorrected." *State v. Webber*, 982 S.W.2d 317, 320 (Mo.App.1998). We review Defendant's allegations of error under Point II with this standard in mind.

■ In order to ensure that a defendant receives a fair trial, the trial judge must maintain absolute impartiality during the proceedings. *Id.* at 321. The trial court is obligated to maintain a position of neutrality and should avoid any conduct which might be construed as indicating a belief on the part of the judge as to the defendant's guilt. *Id.* We must determine whether the trial court's remarks could have prejudiced the minds of the jury against the defendant based upon the context and words used in this case. *Id.* "There is no error as long as the trial judge does not express an opinion as to the nature, content, or truthfulness of evidence." *Id.*

■ We address, in turn, each instance in which Defendant challenges the trial

court's impartiality. First, Defendant claims the trial court demonstrated its bias against defendant during voir dire by referring to "the abducted children" and informing the jury, in response to a juror's question, that the "State had declined to produce the children to protect them from further harm." Defendant argues that these comments left "the inescapable message" that the children had already suffered substantial harm in Defendant's care. We disagree.

The court did refer to the "abducted children." However, there was no dispute that the children had been abducted from their homes in North Dakota. Indeed, Sharon, Quinta, and Mark were convicted in North Dakota of crimes connected to the abduction of the children. Therefore, the trial court made only a truthful comment in referring to the children as "abducted."

■ Similarly, when the trial court explained the State was declining to call the children to testify in order to protect them from further harm, it was not suggesting Defendant had inflicted any harm on the children. Arguably, the State felt the children had already been traumatized when law enforcement raided the farm, took the children from their home of the past five years, and placed them in a juvenile facility. A logical conclusion would be that the State felt it would cause "further harm" to the children to force them to testify against the grandfather they love. Nothing in the court's statement suggested a belief in Defendant's guilt.

■ Next, Defendant contends the trial court showed bias against him during his opening statement. Defendant informed the jury he would introduce letters from the children showing they had been "child molested." The State objected, and the trial court reminded Defendant that it had sustained a motion in limine as to that

evidence and it should not, therefore, be discussed. Defendant persisted in discussing the issue of child molestation.

Thereafter, the State asked the court to instruct the jury that there was no factual basis for the allegations. The court stated, "Ladies and gentlemen of the jury, I want you to know that the Court in a pretrial hearing has made the decision that there's no factual basis for any allegations that these children were abused prior to their taking." Defendant maintains the trial court should have reprimanded him outside the jury's presence or simply instructed the jury to disregard the remarks without noting that it had already ruled prior to trial that there was no factual basis for his claims. This suggestion has no merit.

Defendant persisted in raising a subject that the trial court had specifically ruled was inadmissible. The trial court held a hearing outside the presence of the jury to determine whether there was a basis for Defendant's claim and found there was none. It was Defendant and not the trial court who raised this issue in front of the jury. The trial court was compelled by Defendant's stubborn refusal to drop the matter to inform the jury it had already determined that there was no factual basis for the claim. This was not a demonstration of prejudice against Defendant but merely an attempt to prevent Defendant from placing nonprobative issues before the jury.

■ Defendant's next complaint involves the fact that the trial court held him in contempt of court in the presence of the jury and informed him that he could be in jail "maybe longer than you think." During Carol Winrod's testimony, Defendant tried to introduce into evidence the letters which purported to show that the children had been sexually abused prior to being taken from their fathers. The trial court

ruled that the letters were not admissible. The following exchange then took place:

DEFENDANT: Why are they inadmissible?

THE COURT: Because the judge has determined them to be inadmissible and I've told you that before.

DEFENDANT: Because they deal with child molesting.

THE COURT: Just a minute, Mr. Winrod, I told you you are not to discuss that with the jury. Do not do it again.

DEFENDANT: I do not have a trial. Without the truth I do not have a trial.

THE COURT: Do you wish to proceed and ask Ms. Winrod more questions?

DEFENDANT: She was present at the writing of those letters.

THE COURT: Do you wish—

DEFENDANT: She saw them.

THE COURT: Do you wish to ask her more questions?

DEFENDANT: The next thing I was going to show her was one of the letters.

THE COURT: They're already ruled inadmissible, period.

DEFENDANT: To protect the child molesters.

THE COURT: I told you again, you shall not mention that in this courtroom.

DEFENDANT: Grandpa was looking after children; he loved the children.

THE COURT: Mr. Winrod, if you mention it one more time, I'm going to hold you in contempt.

DEFENDANT: That would be just because I hold you in contempt and my God does, too.

THE COURT: You are in contempt.

DEFENDANT: I'll show you from scripture how you're in contempt.

THE COURT: You're in contempt a second time.

DEFENDANT: Are you going to put me in jail?

THE COURT: Maybe longer than you think.

DEFENDANT: There is no trial, the jury has heard enough to make its determination.

Defendant argues that the trial court should have made its contempt determination outside of the jury's presence and that the court's comments sent "the obvious message that the trial court was contemplating a lengthy sentence for an obviously guilty [Defendant]." We find no validity in this contention.

"A court has inherent power to punish contemptuous acts and to preserve and vindicate the law's power and dignity." *State ex rel. Picerno v. Mauer*, 920 S.W.2d 904, 910 (Mo.App.1996). Section 476.110.1 empowers every court of record to punish for criminal contempt "[d]isorderly, contemptuous or insolent behavior committed during its session, in its immediate view and presence, and directly tending to interrupt its proceeding or to impair the respect due its authority." A trial court may punish a person for contempt, even in the presence of the jury if necessary, based upon the circumstances of the case. *State v. Nevills*, 530 S.W.2d 52, 54 (Mo. App.1975).

It is true that a judge must refrain from statements which suggest an opinion as to an issue at trial or which might prejudice the jury against the defendant. *State v. Idlebird*, 896 S.W.2d 656, 665 (Mo.App.1995). When determining the propriety of a judge's comments, we look to whether the comment "(1) was volunteered by the trial judge, (2) was not made in response to an objection as part of the court's ruling, (3) was made in the

presence of the jury, (4) could have been construed by the jury to the prejudice of the defendant, or (5) indicated to the jury that it was not to reach its own determination of the facts." *Id.* at 665–66. "The ultimate issue is whether the judge's conduct was such as to prejudice the minds of the jurors against the defendant, thereby depriving defendant of a fair and impartial trial." *Id.* at 666.

In the instant case, Defendant provoked the confrontation in front of the jury. The court's comment concerning the amount of jail time was merely in response to Defendant's inquiry about whether he would be jailed for his contempt of court. Although the trial court held Defendant in contempt of court, it did not express an opinion as to the issue of Defendant's guilt or innocence of the crime charged or as to the nature or truthfulness of the evidence. We cannot say the trial court's finding of contempt or accompanying comments were of such a nature as to prejudice the minds of the jury against Defendant and deprive him of a fair trial.

In his final contention under Point II, Defendant complains that the trial court "remained silent and refused to enforce witness Carol Winrod's Fifth Amendment privilege against self-incrimination after it had been invoked ... and thereby allowed the prosecution to introduce evidence of [Defendant's] highly controversial but irrelevant religious beliefs." Defendant suggests this allowed the trial court to communicate to the jury "through it's nominee, the prosecutor, the trial court's personal animus toward [Defendant]."

During cross-examination of Carol Winrod, the State asked the witness whether she believed, like her father, that the officers of the court and law enforcement officials are Jews or the followers of Satan. When the witness testified that she believed some of them are Satan's followers, the State asked if she believed it was acceptable to lie to them. The witness answered that she believed all "liars will have their part and burn in the fire and brimstone." The State then asked if the children were on Defendant's property on certain dates. The witness stated that she chose to plead the Fifth Amendment. The State then asked a series of questions concerning whether Defendant had the children on his farm at that time. Again, the witness said, "I plead the 5th." Defendant maintains that by allowing this questioning the trial court impermissibly led the jury to believe Defendant is a "bigoted, religious zealot who should be removed from society."

 The privilege against self-incrimination is a personal right that may only be affirmatively claimed by the witness, not a third party. *State v. Ohmes,* 675 S.W.2d 681, 683 (Mo.App.1984). Therefore, Defendant has no ground for complaint unless his own Fifth Amendment rights were violated. *See State v. Phillips,* 511 S.W.2d 841, 845 (Mo.1974); *State v. Benson,* 633 S.W.2d 200, 202 (Mo. App.1982). Accordingly, Defendant has no claim of error based upon any alleged violation of Carol Winrod's right against self-incrimination.

 The trial court allowed the State to delve into the witness's beliefs about the nature of officers of the court and law enforcement officials and whether she believed it was acceptable to lie to them based upon these beliefs. This line of questioning related to the witness's credibility and was therefore reasonable. To determine otherwise would call into question the trial court's neutrality anytime it allowed the State to raise credibility issues with a defense witness. In sum, the trial court did not demonstrate to the jury a belief in Defendant's guilt by allowing this line of questioning. None of Defendant's

numerous bias claims under this point have merit. Point II is denied.

The judgment is affirmed.