**STATE of Missouri, Respondent,**

v.

**Mark MANZELLA, Appellant.**

**No. ED 81894.**

Missouri Court of Appeals, Eastern District, Division Four.

Feb. 24, 2004.

C. Clifford Schwartz, Clayton, MO, for appellant.

Karen L. Kramer, Assistant Attorney General, Jefferson City, MO, for respondent.

PATRICIA L. COHEN, Judge.

Mark A. Manzella ("Defendant") was convicted by a St. Louis County jury of

first degree murder and armed criminal action. The trial court sentenced Defendant to consecutive terms of life without possibility of parole and twenty-five years' imprisonment. Defendant appeals his convictions on the grounds that the trial court erred in: (1) excluding evidence of victim Kevin Clark's ("Clark") indictment for a drug-related crime and his involvement in drug sales at his workplace; (2) failing to *sua sponte* declare a mistrial following the prosecutor's mention of excluded evidence in closing argument; (3) allowing Tammy Manzella to state her belief as to the location of a telephone call Defendant made to her on the morning of the murder; (4) refusing to allow Defendant to testify regarding the meaning of certain items on his wireless telephone bills; (5) admitting photographs of certain guns and ammunition; and (6) denying Defendant's request to be present at a post-conviction hearing to settle a dispute regarding the transcript. Finding no error in any of the respects alleged, we affirm.

█ Defendant does not challenge the sufficiency of the evidence supporting his conviction. On review, we view the evidence in the light most favorable to the verdicts and we do not consider contrary or adverse evidence. *State v. Crawford*, 68 S.W.3d 406, 407–08 (Mo. banc 2002).

Defendant and his then-wife, Tammy Manzella and Kevin and Brenda Clark were friends and co-workers at Hussmann Refrigerator Co. ("Hussmann"). In April of 1998 or 1999, Kevin Clark and Tammy Manzella began an affair.

In November 2000, Defendant and Tammy Manzella separated and Defendant began living with his parents. During November 2000, Defendant communicated with Clark's wife that he believed Clark and Tammy Manzella were having an affair. On December 31, 2000, Clark admitted to Defendant during a telephone conversation that he was having an affair with Tammy.

During April 2001, several Hussmann employees noticed Defendant driving on the Hussmann parking lot in his blue van. On at least one occasion, Defendant had a conversation with William Mister ("Mister"), a Hussmann employee, in which he asked Mister if he knew about Clark and Tammy. Mister saw Defendant on the Hussmann lot on at least four or five occasions in the morning and on one occasion Defendant told Mister, "I just missed them."

Defendant and Tammy Manzella divorced in May 2001. During the months prior to the divorce, Defendant left many messages on Tammy Manzella's telephone answering machine. In some of Defendant's messages, he directly threatened to harm Clark. Defendant went to Clark's house and threatened Brenda Clark with harm to her husband.

On June 3, 2001, Tammy Manzella dropped her and Defendant's children at Defendant's mother's house, where Defendant was then living. Later that evening, Defendant called Tammy Manzella and told her not to have the children around Clark. Defendant also called Clark twice the same evening and in one call told Clark it was time for them to meet.

On June 4, 2001, in the early morning, six Hussmann employees saw either a blue van or a van they recognized as Defendant and Tammy Manzella's van in the Hussmann parking lot. Several Hussmann employees testified to hearing a popping sound, which could have been gunfire, at or near the time the van was in the parking lot.

A janitor who reported to Hussmann for work at 7:00 a.m. on June 4th spotted Clark in his car on the Hussmann lot and notified a security guard. Another em-

ployee also reported to work at 7:00 a.m., parked directly behind Clark's car and observed him not moving and with blood behind his ear. This employee also alerted security.

The first police officer on the scene found Clark lifeless in his car. Clark's car window was down, his keys were in his hand, and the engine was off. Clark had a $100.00 bill in his pocket and no drugs were found in the car. The officer discovered a spent .45 caliber casing on the ground near the scene.

An officer from the Bridgeton Police Department drove to Defendant's mother's house and received consent for a limited search. The officer seized a box of .38 caliber bullets. Another Bridgeton police officer arrived at Defendant's residence between 10:00 a.m. and 10:30 a.m. on June 4th and after locating the blue van, placed his hand near the radiator and detected warmth.

The Bridgeton police took Defendant into custody on June 4, 2001. Defendant denied involvement in Clark's murder but admitted he did not want his children around Clark because he had a sexual relationship with Defendant's wife, caused the break-up of Defendant's marriage, and was a drug dealer.

Defendant claimed that he had not been driving his van since about 7:30 a.m. on June 3rd, and that the van had mechanical problems. In the course of the police investigation, the van was test-driven and exhibited no problems.

Defendant denied to the police that he owned guns. However, following the execution of a search warrant at Defendant's residence, police seized a box of .45 caliber bullets which contained live and spent shell casings, National Rifle Association targets, and a parts drawing for a .45 auto Colt firearm. At trial, witnesses testified that

Defendant talked about owning a Colt .45 Model 1911 firearm. One witness had purchased a .45 magazine for Defendant. Another witness testified to demonstrating for Defendant how to disassemble and reassemble an M1911A1 automatic .45 caliber pistol. The State adduced evidence that the .45 caliber shell found at the scene of the shooting and the spent shells seized at Defendant's residence were fired from the same weapon. The most common type of firearm firing this type of casing was a Colt 1911 or 1911A1 .45 caliber pistol.

Defendant's cellular phone records reflected twelve telephone calls to Tammy made between 5:46 a.m. and 6:26 a.m. on June 4th. Based on an analysis of records indicating the cellular towers used to transmit the calls, Defendant did not make the calls from his residence.

### Discussion

#### A.  Exclusion of evidence

##### 1.  Clark's pending drug case

Defendant claims the trial court abused its discretion by excluding evidence that Clark had a pending case for drug distribution. This Court will not interfere with a trial court's ruling on the admission or exclusion of evidence absent a showing that the trial court's ruling is against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice. State v. Skaggs, 74 S.W.3d 282, 285 (Mo.App. E.D.2002).

The defense theory was that someone other than Defendant murdered Clark because Clark had either a pending case or a grand jury proceeding at the time of his murder. Defendant tried to introduce evidence of the indictment in a variety of ways. In general, although the trial court allowed in some evidence that Clark was a drug dealer, it excluded specific testimony regarding his indictment.

The State argues that before Defendant could properly offer evidence of another individual's responsibility for the murder, he was required to demonstrate "that the other person did some act directly connecting that person with these crimes." *State v. Davidson,* 982 S.W.2d 238, 242 (Mo. banc 1998). In addition, "the evidence must be of the kind that directly connects the other person with the *corpus delicti* and tends clearly to point to someone other than the accused as the guilty person." *State v. Rousan,* 961 S.W.2d 831, 848 (Mo. banc 1998), *cert. denied,* 524 U.S. 961, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998) (citation omitted).

Here the evidence Defendant sought to introduce—Clark's indictment—failed to connect anyone other than Defendant to the crime. Although the evidence might in some general way suggest an alternative motive for the crime, it did not even cast suspicion on an identifiable person. Accordingly, the trial court did not err in excluding evidence of Clark's indictment.

### 2. *Drug sales at Hussmann*

Defendant also contends that he was prevented from offering evidence through a Hussmann employee, William Mister, that Clark sold drugs at Hussmann. Defendant has not, however, identified what Mister would have testified to had the trial court allowed Defendant's questions. Moreover, Defendant did not make an offer of proof at trial, thus he has failed to preserve the issue for review. Even if we review the issue for plain error, Defendant has not pointed to anything in the record which demonstrates that the trial court's limitations on the questioning of Mister prejudiced Defendant's defense in any way. Point one is denied.

### B. *State's closing argument*

Defendant claims the trial court erred when it failed to *sua sponte* declare a mistrial following the prosecutor's closing argument in which he referred to Defendant as the only individual angry with Clark. Specifically, the prosecutor stated:

> You have motive all over the place on this. The Defendant was angry at Kevin Clark. In fact, you don't have anyone else in front of you that was angry with Kevin Clark. It's this man. Absolutely this man.

As an initial matter, Defendant failed to object to the prosecutor's closing argument during trial. Accordingly, we review this issue under a plain error standard. To warrant relief for plain error, Defendant must establish either manifest injustice or a miscarriage of justice. *State v. Barriner,* 34 S.W.3d 139, 145 (Mo.2000). As the State has pointed out, "[r]elief should rarely be granted on an assertion of plain error with respect to a closing argument." *State v. Smith,* 32 S.W.3d 532, 551 (Mo. banc 2000).

In support of his argument, Defendant cites three cases, *State v. Weiss,* 24 S.W.3d 198, 202–03 (Mo.App. W.D.2000), *State v. Luleff,* 729 S.W.2d 530, 535–36 (Mo.App. E.D.1987), and *State v. Hammonds,* 651 S.W.2d 537, 539 (Mo.App. E.D.1983), for the proposition that the State improperly commented on evidence excluded by the trial court. These cases involve statements made during closing argument suggesting the defendant failed to present evidence, when in fact the prosecution knew such evidence had been excluded. In this case, the trial court excluded evidence regarding Clark's indictment. Had the State commented on Defendant's failure to present evidence of Clark's indictment, Defendant's cases might provide some guidance. But where, as here, the evidentiary void is not attributable to the trial court's ruling, the prosecutor may properly comment on it.

■ Given the propriety of the prosecutor's comments, a mistrial is not an appropriate remedy. A mistrial is a drastic remedy and "a court should take such action *sua sponte* only in exceptional circumstances." *State v. Clay*, 975 S.W.2d 121, 134 (Mo. banc 1998). Defendant has failed to demonstrate exceptional circumstances here. Accordingly, we deny point two.

## C. *Lay witness opinion testimony*

■ Defendant argues the trial court erred in allowing Tammy Manzella to testify that Defendant sounded like he was calling from his car the morning of the crime because Tammy Manzella's opinion unfairly undercut his alibi defense. In response to Defendant's argument, the State cites *State v. Gray*, 731 S.W.2d 275, 284–85 (Mo.App. W.D.1987) for the proposition that Tammy Manzella's testimony was properly admitted because it was based on her personal observations and in accord with the ordinary experience of everyday life. We agree.

The testimony in dispute is as follows:

Q: Did it sound to you as if he were inside or outside based upon what you could hear.

MR. SCHWARTZ: Well, Your Honor, I'm going to object. There's been no foundation laid for this, and it requires total speculation on the witness' part.

THE COURT: Overruled

Q: (By Ms. Murphy) That means you can answer.

A: Yes, it sounded like he was driving in the van or in the car.

Q: What makes you think that, ma'am?

A: Because you can sometimes hear like a tunnel or something when they are driving in a car, and it sounded like he was driving in a car.

■ Although a lay witness usually is precluded from offering opinions, the witness may testify to facts within her personal knowledge. *State v. Campbell*, 26 S.W.3d 249, 253 (Mo.App. W.D.2000). Tammy Manzella testified to what she understood to be true in the context of her everyday experiences. She provided a reasonable explanation for her belief that Defendant was inside his car rather than inside his home. The jury was free to agree or disagree with her statement.

■ Furthermore, even if Tammy Manzella's testimony was properly excludable, it did not, in light of other testimony, prejudice Defendant. During the trial, evidence of Defendant's whereabouts during Clark's death was strong. The State produced expert testimony demonstrating that Defendant's conversations with Tammy Manzella were transmitted from cellular towers near the shooting rather than near his home. Numerous witnesses testified that they saw a van identical to Defendant's at Hussmann the morning of the shooting. Moreover, a police officer testified that Defendant's van was still warm when he felt it at Defendant's parent's home shortly after Clark's death. Point three is denied.

## D. *Wireless telephone records*

■ The State introduced Defendant's Cingular wireless records and produced Matthew Lehnen ("Lehnen"), a radio frequency performance engineer for Cingular, to identify Defendant's location when he called Tammy Manzella the morning of the crime. Lehnen testified that Defendant called Tammy Manzella from his cell phone in the vicinity of the crime scene based on how the calls were relayed from cellular towers. Defendant argues he was denied the opportunity to rebut Lehnen's testimony through his own knowledge regarding cellular towers. The trial court

allowed Defendant to testify about certain aspects of his cellular bill, such as telephone calls made and received and charges. However, the trial court determined that Defendant was not qualified to discuss the portion of the record referring to cellular towers.

■ We uphold the trial court's exclusion of evidence absent a clear abuse of discretion. *State v. Winfield,* 5 S.W.3d 505, 515 (Mo. banc 1999). In this case, the trial court determined that testimony regarding cellular towers was outside the realm of common knowledge. Specifically, the court ruled:

> To the extent they are things within common knowledge, the witness may testify as to what they are. To the extent that they are something which would refer to a tower from which the phone message was received or which has symbolic meaning, I'm going to sustain the objection.

■ Defendant argues that even if the trial court considered cellular towers a topic for expert testimony, Defendant's past experiences qualified him to testify. A proper foundation must be laid to establish the expertise of a witness. *State v. Bradley,* 57 S.W.3d 335, 340 (Mo.App. S.D. 2001). The proponent must show that the witness has sufficient knowledge and experience and is acquainted with the subject matter. *Id.* The determination of whether a proper foundation is established is within the discretion of the trial court. *Id.*

In an offer of proof, Defendant claimed his expertise was based on his life experiences and ten years as a customer of Cingular. Defendant's offer of proof falls short of the requisite demonstration of materiality and relevance. *State v. Bowens,* 964 S.W.2d 232, 238 (Mo.App. E.D.1998). Defendant did not demonstrate how his experiences as a Cingular customer quali-

fied him to testify about cellular towers. We deny Defendant's fourth point.

E. *Photographs of ammunition and weapons*

■ Defendant claims the trial court erred in failing to *sua sponte* declare a mistrial, following the State's introduction of photographs of guns and ammunition found at Defendant's residence. The State argues that Defendant neglected to object to the admission of this evidence and has therefore waived any error. Alternatively, the State contends that any error in admission of the photographs fails to rise to the level of plain error. We agree that because Defendant did not object to the photographs at trial, he has waived any error and we review only for plain error. *State v. Roberts,* 948 S.W.2d 577, 592 (Mo. banc 1997). To prevail, Defendant must demonstrate a manifest injustice or miscarriage of justice. *Id.*

Defendant claims the guns and ammunition were unrelated to the murder and used to improperly suggest that he was a dangerous person. The State argues that the evidence was introduced to establish that Defendant lied to the police about his gun ownership to hide his guilt. We do not find the admission of this testimony resulted in a miscarriage of justice.

F. *Denial of writ of habeas corpus ad testificandum*

■ In May 2003, Defendant filed with this Court a Motion to Settle Disputes Concerning the Correctness of the Transcript. We granted the motion and remanded the matter to the trial court with instructions to "settle the dispute in accordance with Rule 81.15(d) and certify to this Court no later than September 19, 2003 the correct contents of the record."

The trial court noticed the matter for hearing. Defendant filed an Application for Writ of Habeas Corpus Ad Testifican-

dum ("Application") requesting the State to produce him because he was a material witness and his presence was necessary for a full and fair hearing. The trial court denied his Application. In response, Defendant filed an Objection to Court's Denial ("Objection") challenging the denial on state and federal constitutional grounds and again asking the trial court to issue the writ. The trial court denied the Objection.

Thereafter, the trial court held a hearing in the presence of defense and State counsel. Defendant was not present and his counsel objected to his absence. The trial court noted in response to counsel's objection that the hearing was not testimonial or evidentiary and was neither required by Supreme Court rule nor this Court's order.

■ As an initial matter, the granting of a writ of habeas corpus ad testificandum lies within the discretion of the trial court. *Laws v. O'Brien*, 718 S.W.2d 615, 618 (Mo. App. E.D.1986); *State v. Winrod*, 68 S.W.3d 580, 586 (Mo.App. S.D.2002). In assessing whether to grant such a writ, a trial court should require "strict proof of the materiality of the testimony and the necessity of attendance of the prisoner as a witness." *Winrod*, 68 S.W.3d at 586. In the instant case, Defendant's Application provided the trial court with nothing more than a conclusory allegation that he was a material witness. Clearly, the trial court did not abuse its discretion in denying the Defendant's application for the Writ.

■ Both Defendant and the State focus on whether Defendant has a Missouri and/or federal constitutional right to be present at a post-trial hearing to correct a transcript. Defendant contends that his absence violated the Fifth and Fourteenth Amendments to the U.S. Constitution and

Article I, Section 10 of the Missouri Constitution.[1] The State argues that because the hearing was not a critical phase of the trial process, Defendant had no state or federal constitutional right to be present.

Although it does not appear that Missouri courts have considered the precise question presented, the Missouri Supreme Court has analyzed a defendant's due process challenge in an analogous context. In *State v. Smulls*, 935 S.W.2d 9 (Mo. banc 1996), the defendant, who had been sentenced to death, appealed to the Supreme Court the trial court's denial of his Rule 29.15 motion. During the pendency of the appeal, the Supreme Court remanded the matter to the trial court to hold a hearing for the purpose of making gender *Batson* findings. Following notice of the hearing, the defendant filed a petition for writ of habeas corpus ad testificandum which the trial court denied. On appeal, the defendant argued that his constitutional right to be present was violated by the trial court's denial of the writ.

The Supreme Court held that "a defendant has a ... due process right to be present, 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge....'" *Id.* at 17 (citing *United States v. Gagnon*, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985)). Noting that, like here, the post-trial hearing presented no witnesses or evidence against defendant, the Court applied the *Gagnon* analysis and held that defendant's constitutional right to be present was not violated:

> It did not require defendant's input nor did it call for any decision or reaction from defendant. Defendant had nothing to do or gain from his presence there. The court did not err by denying the request.

---

1. With respect to his state constitutional argument, Defendant has challenged in this Court the Application's denial only on the basis of

Article I, Section 10 of the Missouri Constitution and therefore we will limit our discussion to the application of Article I, Section 10.

Defendant relies heavily on *Terry v. Cross,* 112 F.Supp.2d 543 (E.D.Va.2000). *Terry* turned on the district court's finding that defendant Terry's presence at a post-trial hearing to correct a transcript "would have contributed to his ... opportunity to defend himself against the charge." *Terry,* 112 F.Supp.2d at 553. In contrast to this case, the defendant in *Terry* identified a specific factual disagreement regarding the transcript which his testimony might have clarified. Moreover, the factual ambiguity was critical to Terry's claim of actual innocence. Defendant here has failed to establish that he "could have done or gained anything by attending the hearing." *State v. Middleton,* 998 S.W.2d 520, 526 (Mo. banc 1999). Accordingly, his point is denied.

### Conclusion

The judgment of the trial court is affirmed.

BOOKER T. SHAW, P.J., and LAWRENCE G. CRAHAN, J., Concur.