991 A.2d 172

**Aubrey David WILDER**

v.

**STATE of Maryland.**

**No. 1122, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

March 25, 2010.

320

Amanda M. Downs (Nancy S. Forster, Public Defender, on the brief), Baltimore, for appellant.

Edward J. Kelley (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for appellee.

Panel: HOLLANDER, MEREDITH, and J. FREDERICK SHARER (Retired, Specially Assigned), JJ.

J. FREDERICK SHARER, Judge, Retired, Specially Assigned.

In the Circuit Court for Baltimore County, Aubrey David Wilder, appellant, was convicted by a jury of various charges of first-degree assault, reckless endangerment, and the use of a handgun in the commission of a crime of violence.[1]

---

**1.** Wilder was sentenced to concurrent prison terms of 25 years for the assault convictions and five years' incarceration for the handgun con-

In this appeal, Wilder raises four issues, which, as recast and reordered, are: [2]

I. Whether the evidence is sufficient to sustain the convictions.

II. Whether the trial court abused its discretion by admitting "other bad acts" evidence.

III. Whether the trial court abused its discretion by permitting a police officer to provide lay opinion testimony.

IV. Whether the trial court abused its discretion by not removing a juror who had raised doubts about her ability to be "fair and just."

We conclude that the trial court abused its discretion by permitting testimony about cellular tower site location without qualifying the State's witness as an expert, and that the error is not harmless beyond a reasonable doubt. Therefore, we shall vacate Wilder's convictions and order a new trial on all counts except for the handgun charges. With respect to the handgun count, we are unable to hold that the evidence establishes beyond a reasonable doubt that Wilder used a "handgun" in the commission of the offenses, and shall reverse. We further conclude that the trial court did not abuse its discretion by admitting evidence of a prior threat made by Wilder, and did not abuse its discretion by not granting a mistrial. Finally, we need not consider appellant's challenge to the trial court's decision not to remove a juror, as that issue is not likely to recur in a retrial.

---

viction. The reckless endangerment counts were merged for purposes of sentencing.

**2.** Wilder's specific contentions are:

 I. The trial court erred in allowing Detective Hanna to give inadmissible expert testimony.

 II. The evidence was insufficient to sustain Appellant's convictions.

 III. The trial court erred in failing to remove a juror who admitted she could not be a "fair and just" juror.

 IV. The trial court erred in admitting evidence of Appellant's prior bad acts.

## FACTUAL AND PROCEDURAL HISTORY

The genesis of the charges against Wilder is a shooting incident that took place in the early morning hours of July 25, 2007, in Windsor Mill, Baltimore County. A gunman fired four shots at the residence of Robert Lee Williams, Jr., at 3314 Lynne Hall Drive.[3] At the time, the residents of the house included Williams's father; his son, Robert Lee Williams III (Robert); Robert's girlfriend; two children; a niece, Lavivian Jones, and her child, Zaire. Williams was acquainted with Wilder through Jones. Wilder is the father of Jones's son.

Williams testified that on the afternoon of July 24, 2007, he was outside of his house, along with Jones, her child, and Robert. Wilder drove up, stopped across the street from the house, and walked up to Jones at the edge of the property. Williams explained that because Wilder was forbidden to be on his property, he could go no further when visiting Jones and their child. Wilder had not been welcome at the Williams house because he and Jones "always had issues."

Wilder and Jones at first conversed quietly. They began to argue, however, and Wilder, who was holding the child, walked back towards his car. Jones became concerned that Wilder would drive away without securing Zaire in a car seat, and she prevailed upon her cousin, Robert, to intervene. Robert suggested to Wilder that he place the child in a car seat. Wilder took offense, and an argument arose. Robert explained why he intervened in the dispute:

> Well, at some time [Wilder] was tryin' to take him. And, you know, no car seat. And I was, um, basically comin' to stop him from takin' the baby 'cause he was takin' it with no car seat.

> And my cousin [Jones] was tellin' me, you know, come, cause he was tryin' to take the baby.

---

3. Robert Lee Williams, Jr., is the homeowner. We shall refer to him throughout as Williams, and his son as "Robert."

\* \* \*

When I got down there I told him, you know, you ain't takin' the baby. And specially, you know, you ain't got no car seat. You know what I'm sayin'?

And then after that I guess he, you know, went on the offensive, sayin', this is my son, whatever, whatever.

So he tryin' to get in the car with the baby with no car seat.

Robert alluded to threats Wilder had made during an earlier conversation with Robert's mother, and further described his confrontation with Wilder on the afternoon before the shooting:

A. And I said, due to the past comments you made, you know, previous to my mother, and threats.

\* \* \*

A. I said, you got nerve to come around here with this, you know.

That's when I—I was kinda upset, you know, 'cause what he said to my mother and all that.

So I asked him to step out of the car, you know. He— like, he ain't step out of the car. He ain't do none of that. Still got the baby in his hand.

So I'm like, step out the car. He never step out the car.

Then after that he pulls off with the baby, goes halfway down the street, gets out the car. Ah, you messed up. You messed up. You messed up.

Then he drove off.

Just after driving off, Wilder stopped for a moment and was heard to remark that "he [Robert] just F"ed up." The elder Williams remarked that Wilder's demeanor was "like a tough-guy thing." Jones recounted that after Wilder took Zaire and drove away, she "had to call Baltimore County [police] to get my son back ... because Wilder had Zaire without a car seat."

Williams returned home from work at about 2 a.m. on the morning of the 25th, and remained awake because he had planned to leave for a trip that morning. He had mentioned to his wife that he was concerned by the hostilities between Wilder and Robert, and that "things are gettin' more intense with [Wilder] and Robert, considerin' what happened earlier that day."

Just before he was set to leave on his trip, Williams heard four gunshots. He rushed to the top of the stairs and saw Wilder's Volvo station wagon "pullin' off." Williams recounted that the car was "just pullin' out my driveway, pullin' around the circle." He could not see the driver and could not tell how many people were in the station wagon. Four rounds hit the house and went through the walls. Williams identified four locations where the gunshots hit the house. One round entered a hallway shortly after Williams had passed by that point. Williams described additional damage. Police responded to the scene, and found two shell casings. Williams later discovered two additional bullets as workmen were repairing the house. According to the lead detective, a firearms technician concluded that the bullets recovered were "probably" fired from a "9 millimeter-type handgun, and a 9 millimeter's only fired out of a semi-automatic gun."

The prosecutor asked Williams about an earlier incident that had taken place on July 3, when Wilder threatened to come to the Williams house. Over defense counsel's objection, Williams testified that when his wife told him that Wilder had called her with this threat, he then called Wilder. Wilder "said that Vivian [Jones] disrespected him for the last time and that he was comin' out to our house with a gun." [4]

Williams, who was not at home at the time of the call, instructed his wife, Ursula, to call the police, and an officer responded. When he arrived home, Williams met the officer and discussed the threat. Approximately 20 minutes later,

---

4. The parties stipulated that on July 3, 2007, a Baltimore County police officer responded to the Williams house "for a telephone misuse complaint."

Wilder drove into the cul-de-sac that was adjacent to Williams's house, made a U-turn, and drove away, apparently seeing the police car that was parked in the circle.

Ursula Williams recalled her telephone conversation with Wilder on July 3. Her niece, Lavivian Jones, had borrowed Wilder's car, which Mrs. Williams described as "copperish" in color, and Wilder had called inquiring about the vehicle. Mrs. Williams said that neither Jones nor the car was at the house. Wilder became upset, and threatened to come to the house. According to Mrs. Williams, Wilder said something to the effect that "he didn't care who ... got it." Mrs. Williams called Jones and told her to return the car, and also called her husband, who in turn instructed her to call the police.

When asked why Wilder was not welcome at their house, Mrs. Williams explained that her husband enforced the ban because there had been "incidents" between Lavivian and Wilder. She elaborated:

[PROSECUTOR]: And you also said that the defendant was not welcome in your home because of incidents with or between him and Lavivian?

A. Yes.

Q. And what do you mean by that?

A. Lavivian, she and Aubrey had gone together, but it's like Vivian always get hurt or somethin' when she's with Aubrey, you know. So my husband just—you know, we don't believe in that.

Q. What do you mean, hurt?

A. Hit on, beaten.

[DEFENSE COUNSEL]: Objection.

THE COURT: All right. The objection's sustained.

Defense counsel also requested a mistrial. The trial court denied this motion, noting that, initially, defense counsel failed to object when Mrs. Williams alluded to Lavivian getting "hurt."

Lavivian Jones testified that on the morning of the shootings, she and Wilder were talking to each other on their cell

phones. She recalled that they were talking "off and on" at about 2:30 a.m., when Wilder said that he was at a club. Thinking that everyone assumed that Wilder had fired the shots, Jones called him shortly after the shooting "to see what he had to say." Wilder denied any involvement in the shooting.

Troy McLain Wallace lives across from the Williams house. He was awake just before the shooting. He heard four gunshots, and reacted immediately:

> And I was walkin' down the hallway, and at that time I heard four—what I would consider four shots.
>
> I then looked out my window. I was already up and walkin', so I responded to the window probably within a second. And I looked out, and that's when I viewed the vehicle in the Stowe Court loopin' and the court and goin' out.
>
> At that time I dialed 9–1–1. And I could hear my neighbor across the street, and I hollered back to him—I can't remember what we said to each other, but it was just to make sure he was all right and just to indicate that I just dialed 9–1–1.

* * *

> [The car] was a late model Volvo, a bronze, rust, copper-color car. It's kinda hard to describe.
>
> [PROSECUTOR:] What style of Volvo?
>
> A. It's a little boxy, station wagon.
>
> Q. And had you seen that car before?
>
> A. Yes, ma'am, the day before.
>
> Q. The day before. Okay. Did you know who that car belonged to?
>
> A. The defendant.
>
> Q. When you saw it the day before, did you see the defendant with that car?
>
> A. Yes, ma'am.

Wallace also recounted the scene that took place the afternoon before the shooting. He could tell that "there was some problems[,]" and recalled that there was an argument that "was gettin' kinda hostile."

Detective Hanna [5] was the lead investigator, and it was he who arrested Wilder at his cousin's house on Northwood Drive. Two cell phones were recovered incident to the arrest. Wilder was then taken to the station, where Hanna interviewed him after advising him of his *Miranda* rights.[6] Wilder denied shooting at the house, asserting that he would never shoot at a house where his child was living. He did describe how he had been "disrespected" by Jones, and was also angry with Jones's cousin Robert. Hanna recalled:

> Well, this is what I'm hearing from Aubrey, the defendant. He's telling me that he's being disrespected by this individual, by this other male, who has no right to come in, in his opinion—and, frankly, in mine too. I agreed with him.
>
> He has no right to come into this. And he actually would call Aubrey names ... he was very disrespectful to [Wilder].
>
> And it turned out that [Wilder] ended up leavin'—leavin' the scene kind of in a ... very hastily and in a very angry tone.

Wilder told Hanna that he had been at his cousin's house from 10:00 p.m. on the evening before the shooting until the time he was arrested "a little before lunch." Over objection by defense counsel, on hearsay grounds, Hanna recounted that he had confronted Wilder with the fact that cell phone records suggested otherwise, and the fact that people observed his Volvo at the time of the shooting. Wilder continued to deny that he was involved.

Hanna persisted:

---

**5.** Detective Hanna is not otherwise identified in the record.

**6.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

I just tried to describe to him where the—why we havin' these questions, why this becomes an issue, showing that these hits on those towers indicate that that phone was in the area of the shooting, and then actually moved along the map and ended up hitting on the towers right near Northwood Drive.

\* \* \*

Those towers—the hits we got on those towers also indicated calls in and out from that phone during the time around the shooting and along that so-called path, what I call it, back to the house.

And I had questions to him about certain specific calls . . . it deserved some sort of explanation on his part as to why certain numbers were called at certain times of the day and just how those calls were made.

\* \* \*

He—he offered no explanation. He said . . . other than denying during the interview . . . he would continue to say, I can't help you.

Hanna testified at length about mapping Wilder's whereabouts around the time of the shootings by the use of cell phone tracking and GPS technology. He also determined that the Volvo Cross Country was registered to Wilder.

The defense called two witnesses. Wilder's mother, Arlene, recounted that on July 3 her son had been extremely upset over the fact that Jones had taken his car and had not returned it. In August, following the shootings, Mrs. Wilder went to the Williams house at about 4:30 a.m. and took photographs of the Volvo to substantiate her position that it would be impossible to discern the color of the vehicle at night. Dwayne McKenzie offered alibi testimony. He testified that Wilder and he went to clubs in Baltimore in the late evening and early morning of July 24th and 25th, and then returned to McKenzie's home in Woodlawn at about 4:00 a.m. McKenzie borrowed Wilder's Volvo to take a companion home,

and returned to Woodlawn at about 4:30 a.m. Wilder was asleep on the couch.

We will recite additional facts as they relate to the issues before us.

## DISCUSSION

### *Standards of Review*

The number of issues before us requires the application of several standards of appellate review.

 We review the trial court's rulings on the admissibility of evidence under an abuse of discretion standard. *Bernadyn v. State,* 390 Md. 1, 7, 887 A.2d 602 (2005). With respect to the admission of "bad acts" or "other crimes" evidence, we have plenary review over the legal determination of whether the challenged evidence meets a "special relevance" exception. *Streater v. State,* 352 Md. 800, 809, 724 A.2d 111 (1999). We review the trial judge's refusal to grant a mistrial for an abuse of discretion. *Miles v. State,* 365 Md. 488, 569, 781 A.2d 787 (2001). We review *de novo* the issue of whether the evidence is sufficient to sustain Wilder's convictions. *Hudson v. State,* 152 Md.App. 488, 523, 832 A.2d 834, *cert. denied,* 378 Md. 618, 837 A.2d 928 (2003). In reviewing for sufficiency, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)(emphasis in original). *Accord State v. Smith,* 374 Md. 527, 533, 823 A.2d 664 (2003).

### *1. Sufficiency of the Evidence*

Citing the lack of an identification of the shooter and physical evidence linking him to the scene, Wilder claims that the circumstantial evidence adduced at trial is insufficient to establish his criminal agency, or that a handgun was used in the commission of these crimes. The State responds that the first argument has not been preserved, because the defense

motions for acquittal were argued on different grounds. The State also contends that there is sufficient circumstantial evidence pointing to Wilder as the gunman, and to the nature of the firearm he employed.

At the close of the State's case, the defense moved for acquittals, asserting that the evidence, with respect to first-degree assaults and reckless endangerment counts, failed to establish that the victims in the house were located near the entry points of the four projectiles. Therefore, counsel argues, the inhabitants of the home were not endangered. The defense also asserted that the evidence failed to show that Wilder "ever possessed a handgun, ever shot a handgun, that would qualify for being in possession of a handgun in the use of the commission of a crime of violence." Following the close of all the evidence, the defense submitted on its prior arguments.

We first take up the State's argument that Wilder's sufficiency challenge has not been preserved. Citing *Anthony v. State,* 117 Md.App. 119, 699 A.2d 505, *cert. denied,* 348 Md. 205, 703 A.2d 147 (1997), the State maintains that Wilder's sufficiency contentions have not been preserved because the arguments he raises on appeal differ from those raised before the trial court. A criminal defendant "is not entitled to appellate review of reasons stated for the first time on appeal." *Starr v. State,* 405 Md. 293, 302, 951 A.2d 87 (2008). Thus, Wilder's appellate contention, that the evidence does not establish his participation in the shootings, has not been preserved for our review.

Assuming that the sufficiency issue has been preserved, *see generally Bible v. State,* 411 Md. 138, 982 A.2d 348 (2009), we conclude that the evidence of Wilder's involvement was sufficient to sustain his convictions for assault and reckless endangerment. Even discounting the erroneously admitted cell site evidence that, as will be discussed below, should have been presented through expert testimony, the circumstantial case against Wilder is compelling. Maryland "has long held that there is no difference between direct and

circumstantial evidence." *Hebron v. State*, 331 Md. 219, 226, 627 A.2d 1029 (1993). Most certainly, a jury may not return a guilty verdict "on proof amounting only to strong suspicion or mere probability." *White v. State*, 363 Md. 150, 163, 767 A.2d 855 (2001). Yet in this case, the jury heard testimony from witnesses who saw Wilder's Volvo drive from the scene immediately after the shooting; that Wilder had a verbal altercation with Jones and a hostile confrontation with Robert Williams III on the afternoon of the day before the shootings; and that Wilder had previously threatened to come to the Williams house with a weapon.[7] Taken together, this evidence is sufficient to sustain the jury's finding of criminal agency, and the trial court did not err in denying the defense motions for judgments of acquittal on the assault and reckless endangerment counts.

As to the handgun conviction, Wilder asserts that the evidence is insufficient to establish that a firearm, meeting the statutory definition of "handgun," was employed to fire at the Williams residence.[8] It is well-established that "evidence

---

**7.** As we will explain, we will affirm the trial court's admission of "prior bad acts" evidence.

**8.** The use of a handgun in the commission of a crime of violence is proscribed by Md.Code (2002 & 2006 Supp.), § 4–204(a) of the Criminal Law Article. Section 4–204(a) relevantly provided at the time of the shooting:

§ 4–204. **Use of handgun or antique firearm in commission of crime.**
(a) *Prohibited.*—A person may not use an antique firearm capable of being concealed on the person or any handgun in the commission of a crime of violence, as defined in § 5–101 of the Public Safety Article, or any felony, whether the antique firearm or handgun is operable or inoperable at the time of the crime.
A "handgun," for purposes of Section 4–204(a), is defined as follows:
§ 4–201. **Definitions.**
\* \* \*
(c) Handgun.—
(1) "Handgun" means a pistol, revolver, or other firearm capable of being concealed on the person.
(2) "Handgun" includes a short-barreled shotgun and a short-barreled rifle.
(3) "Handgun" does not include a shotgun, rifle, or antique firearm.

to support a conviction for a handgun crime is insufficient unless a jury can find beyond a reasonable doubt that the weapon used met the statutory definition of 'handgun.'" *Brown v. State*, 182 Md.App. 138, 166, 957 A.2d 654 (2008) (citations omitted). Noting that a handgun was not recovered in this case, we emphasize that "tangible evidence in the form of the weapon is not necessary to sustain a conviction; the weapon's identity as a handgun can be established by testimony or by inference." *Id.* In the case before us, however, we must determine whether ballistics evidence, absent more, is sufficient to permit a reasonable juror to infer that a statutory "handgun" was used by the assailant.

On this record, we conclude that the evidence does not carry the State's burden of proof on the issue of whether the firearm used in the shootings qualifies as a statutory "handgun." The State also points out that witnesses heard gunshots, and claims that "the evidence supported the inference that the firearm used was such that it could be readily concealed, [because] Wilder was able to depart the scene immediately after the shooting occurred without disclosing the firearm's presence."

We are not persuaded by the State's arguments. The fact that witnesses heard gunshots does not tend to identify that the firearm was a handgun, but only that an "operable" firearm was employed. As to evidence of concealment, we note that the assailant drove away in darkness. This fact, for example, does not rule out the use of a rifle.

The State is left with the ballistics evidence. We have recognized that, "[u]nder appropriate circumstances . . . ballistics evidence may give rise to . . . an inference" that the weapon was a handgun. *Brown*, 182 Md.App. at 169, 957 A.2d 654. But the ballistics evidence in the case before us leads only to speculation about whether the firearm used met the statutory definition of "handgun." Hanna's testimony on this point is revealing:

Crim. Law § 4–201(c).

[PROSECUTOR]: Okay. Were you actually ever able to determine if this was a semi-automatic weapon or a revolver?

A. The only indication I got back from our—I guess you'd call them, like, a firearms technician, the indication he gave me was, it was more than likely—and he wasn't—he cannot give a certainty—that it was probably a 9 millimeter-type handgun, and a 9 millimeter's only fired out of a semiautomatic gun.

Again, the trier-of-fact cannot return a guilty verdict "on proof amounting only to strong suspicion or mere probability." *White v. State*, 363 Md. at 163, 767 A.2d 855 (2001). In *Brown*, we iterated that the calibers of bullets found at the scene of a shooting "alone cannot support the inference that a handgun was used." 182 Md.App. at 172, 957 A.2d 654. The technician's statement to Hanna, that the provenance of the rounds that were recovered at the Williams house was "probably" a handgun, does not exclude the fact that the bullets may have been fired by a rifle. The "prosecution's burden of proof is more than possibly, probably, or likely—it is beyond a reasonable doubt." *United States v. Kellam*, 568 F.3d 125, 145 (4th Cir.), *cert. denied sub nom. Michel v. United States*, 558 U.S. ——, 130 S.Ct. 657, —— L.Ed.2d —— (2009).

We therefore reverse Wilder's conviction for use of a handgun in the commission of a crime of violence.

### 2. *Evidence of Prior Bad Acts*

Wilder asserts that the trial court abused its discretion by permitting the State to present testimony that Wilder had threatened to come to the Williams house with a weapon. He argues that this evidence of "bad" conduct was "highly prejudicial" and that it would serve "solely to convince the jury that [Wilder] had a criminal propensity." In a related argument, Wilder contends that the trial court abused its discretion by refusing to declare a mistrial after Ursula Williams referred to an instance in which Lavivian Jones had been "beaten" by Wilder. We are not persuaded.

The State moved, pre-trial, *in limine* for the admission of evidence that "on July 3rd of 2007 [Wilder] made statements to the homeowner that he planned to bring a gun to the location and start shooting." The trial court ruled that the State could present this testimony.

During his testimony, Williams recalled that Wilder threatened to come to the house with a weapon:

[PROSECUTOR]: ... Describe the circumstances under which you had a phone conversation with the defendant.

[WILLIAMS]: My wife called me ... and told me that he had called her and told her he was comin' to our house with a gun.

\* \* \*

I called him and asked what was goin' on. He said that Vivian disrespected him for the last time and that he was comin out to our house with a gun.

And I told him, no, you don't want to bring that to my house. He says, yeah, he's comin'. He said, Mr. Rob, I'm comin' up.

And I said, no, you don't want to come out. Little Rob [Williams III] don't own that house. Lavivian don't own that house. This is my and Miss Ursula's house, so you have no right to bring anything to my house like that.

He said, no, I'm comin.

He said, whoever come out, Little Rob, whoever, they goin' down.

He said, only way that won't happen, if you put your niece [Jones] out.

And I told him, you don't tell me who to put in my house and who to let out of my house.

So I told him, if you comin,' I'll meet him. And I was there waitin' on him.

A bench conference ensued, and defense counsel voiced his objection:

[DEFENSE COUNSEL]: Your Honor, same objection I put on before during the pretrial motions. This testimony is beyond highly inflammatory. It's so prejudicial. It has no probative value whatsoever. It's not going to an ID. It's going just to inflame the jury.

He's talking about a conversation ... three weeks earlier. Nothing was acted upon at that point. The State's using this solely to show the jury—I mean, it's clearly gonna prejudice them against my client. I don't think I can say anything more clearly than that, Your Honor.

The prosecutor responded:

[PROSECUTOR]: It is permitted for the State to use under the *Faulkner* case, as I argued in my motion.

\* \* \*

I haven't gotten to it yet, but there will be testimony that the police were called and did make a report in connection with the incident, which means that there is clear and convincing evidence that the conversation actually took place ... and it goes to an essential element of the State's case establishing the identity of the person who shot the home. And then we have the defendant making a statement of intent to shoot the home and bring a gun there.

It is extremely probative, Your Honor.

The trial court overruled the defense objection.

After hearing Wilder's threat, Williams instructed his wife to contact the police, and a cruiser responded. Shortly after Williams returned home, Wilder drove by Williams's house in the brown Volvo station wagon. Wilder made a U-turn before arriving at the house "because [according to Williams] I guess he saw the police sittin' there in the circle."

The second ruling of which Wilder complains involves the trial court's refusal to declare a mistrial after Mrs. Williams, in describing the stormy relationship between Jones and Wilder, referred to instances when Jones was "beaten." The court sustained counsel's objection to this testimony, but de-

nied counsel's motion for a mistrial after offering to strike the offending testimony.

This issue arose during the direct examination of Ursula Williams:

[PROSECUTOR]: And you stated that the defendant was not welcome in your home because of incidents with or between him and Lavivian.

A. Yes.

Q. And what do you mean by that?

A. Lavivian, she and Aubrey had gone together, but it's like Vivian always got hurt or somethin' when she's with Aubrey, you know. So my husband just—you know, we don't believe in that.

Q. What do you mean, hurt?

A. Hit on, beaten.

[DEFENSE COUNSEL]: Objection.

THE COURT: All right, the objection's sustained.

\* \* \*

[DEFENSE COUNSEL]: Your Honor, I'd like to actually make a motion for a mistrial at this time. The witness testified to prior beatings. We've never heard any of this before. She put that before the jury, that he beat her.

THE COURT: Well, the first question, she said that Lavivian got hurt when she was with the defendant. There had been no objection, no motion.

[DEFENSE COUNSEL]: Well, I didn't think we were getting into physical beatings. And then that's where the witness goes, into physical beatings.

Now they're painting him as a person who beats a woman. I mean, how much more could be put before the jury, Your Honor?

THE COURT: Well, I can ask that—I can advise the jury that that answer is stricken.

[DEFENSE COUNSEL]: But it's still out there, Your Honor.

██ Wilder's argument implicates the application of the "propensity rule" set forth in Md. Rule 5–404(b), which provides:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

Md. Rule 5–404(b). This Rule and "the common law preclude the admission of other crimes [or other acts] evidence, unless the evidence fits within a narrowly circumscribed exception." *Carter v. State*, 366 Md. 574, 583, 785 A.2d 348 (2001). In addition, Md. Rule 5–403 requires the exclusion of relevant evidence if its admission proves to be unfairly prejudicial.

██ The propensity rule is a rule of exclusion. *See Wynn v. State*, 351 Md. 307, 312, 718 A.2d 588 (1998); *Harris v. State*, 324 Md. 490, 500, 597 A.2d 956 (1991). "Evidence of prior criminal acts is not admissible to prove the guilt of the defendant." *Carter*, 366 Md. at 583, 785 A.2d 348. The ordinary prohibition against the admission of "other crimes" evidence "ensure[s] that a defendant is tried for the crime for which he or she is on trial and to prevent a conviction based on reputation or propensity to commit crimes, rather than on the facts of the present case." *Sessoms v. State*, 357 Md. 274, 281, 744 A.2d 9 (2000).

██ In order for other crimes evidence to be admissible, it must pass a three-step test:

First, the evidence must be " 'relevant to the offense charged on some basis other than mere propensity to commit crime.' " ... Second, there must be "clear and convincing evidence that the defendant participated in the alleged acts." ... Finally, "the court must determine that the probative value of the evidence substantially outweighs its potential for unfair prejudice."

*Skrivanek v. State,* 356 Md. 270, 291, 739 A.2d 12 (1999) (citations omitted). The Court has emphasized the need for those "substantive and procedural protections ... to guard against the potential misuse of other crimes or bad acts evidence[.]" *Streater v. State,* 352 Md. 800, 807, 724 A.2d 111 (1999). *See also State v. Faulkner,* 314 Md. 630, 634, 552 A.2d 896 (1989). This analysis extends to "bad acts" that "tend[ ] to impugn or reflect adversely upon [a defendant's] character[.]" *See Klauenberg v. State,* 355 Md. 528, 549, 735 A.2d 1061 (1999).

 We discern no error in the trial court's allowance of testimony about Wilder's threat to come to the Williams house. Testimony that Wilder had earlier threatened to come to the house with a weapon has special relevance to establishing the identity of the shooter in this case, and it is also relevant to Wilder's motive for revenge against Jones and Robert. Moreover, the State established the existence of the threats by clear and convincing evidence, based on testimony from both Mr. and Mrs. Williams. Finally, we see no abuse of discretion in the determination that the probative value of this evidence outweighed potential prejudice. Although the trial court did not articulate the basis for its ruling, it overruled defense counsel's objection only after an extensive argument by the State in favor of admissibility. We presume that the trial judge knew the law and properly applied it in overruling the defense objection to Robert's testimony. *See State v. Chaney,* 375 Md. 168, 179–80, 825 A.2d 452 (2003) (judges presumed to know the law and apply it properly).

 We turn, then, to Mrs. Williams's reference to the beating of Jones, and Wilder's challenge to the trial court's denial of his motion for a mistrial. The court offered to strike the testimony, but counsel declined, stating that "it's still out there, Your Honor." In *Hubbard v. State,* 395 Md. 73, 909 A.2d 270 (2006), the issue was whether the trial court erred by declaring a mistrial after the prosecution called a witness, whose testimony against one co-defendant had been suppressed, to identify the other defendant. The trial court

explained that its action was justified by manifest necessity. *Hubbard*, 395 Md. at 87, 909 A.2d 270. The Court of Appeals disagreed that the trial court was required by manifest necessity to grant a mistrial, because there were reasonable alternatives to that action. Relevant to the case before us, the Court stated:

> Other jurisdictions have considered the exclusion of testimony as a reasonable alternative to declaring a mistrial. In *State v. Dodge*, 564 P.2d 312 (Utah 1977), the Supreme Court of Utah considered whether the trial judge's denial of defendant's motion for a mistrial was proper. The court held that the trial judge correctly declined to grant a mistrial, stating: "The trial court had other alternatives to the mistrial the appellant requested. A motion to strike or exclude the violating witnesses testimony could have been made." *Id.* at 313 (also noting that defendants should avail themselves of "less drastic means" to limit possible prejudice before moving for a mistrial).

*Hubbard*, 395 Md. at 94, 909 A.2d 270.

Certainly, " 'it is unrealistic to expect jurors to ignore seemingly relevant evidence which they have already heard.' " *Id.* (quoting *McKnight v. State*, 280 Md. 604, 615, 375 A.2d 551 (1977)). But, we are unable to conclude that the trial court abused its discretion by refusing to declare a mistrial when counsel declined the court's offer to strike the testimony. *See also Mack v. State*, 300 Md. 583, 603, 479 A.2d 1344 (1984) ("[I]f a question is answered and subsequently an objection is made and erroneously sustained, the erroneous ruling is nonprejudicial in the absence of a motion to strike"), *overruled on other grounds, Price v. State*, 405 Md. 10, 949 A.2d 619 (2008). We note that the " 'declaration of a mistrial is an extraordinary act which should only be granted if necessary to serve the ends of justice.' " *Cooley v. State*, 385 Md. 165, 173, 867 A.2d 1065 (2005)(citation omitted). On these facts, we find no abuse of discretion in denial of the motion for mistrial.

Notwithstanding our conclusion, Wilder has waived any challenge to this testimony, because there was no objec-

tion when Robert testified that he had seen "altercations" between Wilder and Jones. Further, when Robert was asked on cross-examination whether he was angry with Wilder, he responded, without objection:

A. No. Actually, I won't even say angry. It's not really angry.

* * *

You know what I'm sayin'? And for anybody in my family to be, you know, gettin' abused or beat on or somethin' like that, that's somethin' anybody be mad about.

[DEFENSE COUNSEL]: So you protect your family?

A. Yeah. Of course.

■ In *Williams v. State*, 131 Md.App. 1, 26, 748 A.2d 1, *cert. denied*, 359 Md. 335, 753 A.2d 1032 (2000), this Court noted that "[w]hen evidence is received without objection, a defendant may not complain about the same evidence coming in on another occasion even over a then timely objection." The jury thus heard additional testimony from Robert on cross-examination to the effect that there was prior physical abuse.

■ To conclude, we hold that testimony about Wilder's threat to come to the Williams house early in July is especially relevant to the issues of identity and motive. We also conclude that the State proved Wilder's earlier acts by clear and convincing evidence, and that the trial court did not abuse its discretion by implicitly finding that the probative value of this testimony outweighed its prejudicial effect.[9] Fi-

---

9. We note in passing that the harmless error analysis applies to the admission of "other crimes" evidence. *See, e.g., Burral v. State*, 118 Md.App. 288, 298, 702 A.2d 781 (1997), *aff'd*, 352 Md. 707, 724 A.2d 65, *cert. denied*, 528 U.S. 832, 120 S.Ct. 89, 145 L.Ed.2d 75 (1999). On this record, given the evidence of guilt in the form of the admissible evidence of Wilder's earlier threat, and the testimony of witnesses who saw his automobile speed from the scene, we conclude that there is " 'no reasonable possibility that the evidence complained of [testimony of prior physical abuse] . . . contributed to the rendition of the guilty

nally, we see no abuse of discretion by the trial court in denying the defense motion for a mistrial.

## 3. Lay Opinion Testimony

Detective Hanna testified that he utilized cellular telephone tracking to determine that Wilder was in the vicinity of the Williams home at the time of the shooting. Wilder challenges the admission of that testimony.[10] Wilder does not question the reliability of the science at issue, *see Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978), but asserts that such location evidence, and the explanation and interpretation of the cell phone records, requires the presentation of expert testimony.[11]

---

verdict." *Burral*, 118 Md.App. at 298, 702 A.2d 781 (quoting *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976)).

**10.** In 1997, the Eleventh Circuit pointed out that a "cellular telephone, when dialed, emits both an eight-digit Electronic Serial Number, or ESN, and a ten-digit Mobile Identification Number, or MIN, both of which are stored on the cellular telephone's internal microchip. Emission of the ESN–MIN combination ("ESN–MIN") results in charges against the subscriber's account bearing the same numbers." *See United States v. Sepulveda*, 115 F.3d 882, 884 (11th Cir.1997) (citing expert testimony in case). One court has observed that "[c]ell phones operate by bouncing signals off 'cell towers.' The closest cell tower within a cell phone network, and only the closest tower, takes the phone call. Cell towers are usually between two and five miles apart." *State v. Tran*, 712 N.W.2d 540, 545 n. 3 (Minn.2006). A federal court notes that "tracking cellular site information on [a] cell phone . . . turns a cell phone's emitted signal, as it searches for a cell tower, into a tracking device." *United States v. Amaral–Estrada*, 509 F.3d 820, 822 (7th Cir.2007), *cert. denied sub nom. Lira–Esquivel v. United States*, 552 U.S. 1290, 128 S.Ct. 1728, 170 L.Ed.2d 530 (2008). *See generally Guidelines on Cell Phone Forensics*, National Institute of Standards and Technology (U.S. Dept. of Commerce), *available at* http://csrc.nist.gov/publications/nistpubs/800–101/SP800–101.pdf; 2 Clifford S. Fishman & Anne T. McKenna, Wiretapping & Eavesdropping. Surveillance in the Internet Age §§ 28:1–28:12 (2007); Note, *Who Knows Where You've Been?: Privacy Concerns Regarding the Use of Cellular Phones as Personal Locators*, 18 Harv. J.L. & Tech. 307, 308–09 (2004).

**11.** Nor does Wilder challenge the manner by which the State obtained his cellular telephone records. We therefore have no occasion to address various federal statutes that may govern the collection and dissemination of cell phone records and related information, *see* 18 U.S.C. §§ 2701 *et seq.* (2006) ("Stored Communication Act"); Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.* (2006), and

The State responds that this issue has been waived because Wilder's argument on appeal differs from that presented to the trial court. We are satisfied that this issue has been preserved.

At the beginning of the trial, the defense moved *in limine* to exclude testimony about how the police managed to track Wilder's movements, at or near the time of the shootings, by the use of cellular telephone records. Counsel explained the basis for his objection:

[DEFENSE COUNSEL]: Yes, Your Honor. And the second motion is—and I believe the State has an extremely large exhibit to the right, Your Honor, which is a map.

What the officers did in this case is, after the alleged shooting took place,—

THE COURT: What is the nature of the motion?

[DEFENSE COUNSEL]: Oh, I apologize, Your Honor. A motion to—I guess for the State to call an expert witness instead of put the evidence in through a detective. I don't know how you would phrase that though, Your Honor.

THE COURT: Well, therein may lie the problem. You're objecting to—

[DEFENSE COUNSEL]: I'm—I believe the State is gonna try to put phone records in through a detective where I believe they need to put it in through an expert witness.

THE COURT: Well, a detective can be an expert.

[DEFENSE COUNSEL]: I don't—

THE COURT: I don't know. I think you need to refine what this argument is just a bit more.

---

whether the State must obtain a warrant before obtaining a person's cell phone records. *See, e.g., In the Matter of the Application of the United States*, No. 08–4227 (3d Cir. argued Feb. 12, 2010). *Cf. State v. Smith*, 2009 Ohio 6426 ¶ 29, 124 Ohio St.3d 163, 920 N.E.2d 949 (2009) (holding that warrantless search of data *within* cell phone violates Fourth Amendment). Nor need we address the applicability of the Maryland Wiretap and Electronic Surveillance Act, Md.Code (1974, 2006 Repl. Vol., 2007 Supp.), §§ 10–401–10–414 & §§ 10–4A–01 *et seq.* of the Courts and Judicial Proceedings Article ("CJ").

[DEFENSE COUNSEL]: As I was saying, Your Honor, after the alleged shooting takes place—

THE COURT: I guess I need to know the nature of the relief that you seek. Then I'll hear all the facts and legal argument you want.

[DEFENSE COUNSEL]: Well, I—they tracked the phone, Your Honor. That's what I'm alleging.

They call Nextel and they say to Nextel, where is this phone? And the Nextel—

THE COURT: Is it a motion about Nextel?

[DEFENSE COUNSEL]: I guess it's a motion in limine to preclude this officer from testifying to what Nextel told him, I guess would be the best way to say it, Your Honor.

THE COURT: All right. To preclude a detective from testifying as to some hearsay from—

[DEFENSE COUNSEL]: Yes.

THE COURT:—Nextel. All right. Go ahead. You may—

[DEFENSE COUNSEL]: Thank you.

THE COURT:—continue.

[DEFENSE COUNSEL]: After the shooting takes place at 4:46 a.m., Your Honor, the detectives develop my client as a possible suspect, and they get his cell phone number and they start tracking it from that time until when he's arrested at 12 p.m. the next day.

And the State has a map that shows all the locations that his cell phone was, as they say, pinging off of or bouncing off of.

This is information that—my understanding on how it's done is, the detective will contact an organization in the—maybe the Baltimore City or Baltimore County Police Department called TARU, which is—what they do is, they do cell phone tracking, they do the wiretaps, stuff like that.

They call Nextel. Nextel says the phone—they'll ping it. They'll find out where it's hitting off of, what tower, and then they'll call back and say, it's hitting off of tower location blah, blah, blah, whatever the location of the tower

is, and the detective can follow the towers to eventually find the person. And I believe that's what happened here, Your Honor.

I would state that the information relayed to the detective is hearsay, Your Honor,—or the detective relaying it to this Court would be hearsay. There would need to be someone from Nextel who did this tracking to testify to that.

Also, Your Honor, the detectives then at that point do what's called a historical cell phone analysis. They ask Nextel for all prior to this incidences, I think some time before, to find out exactly where my client was prior to this location, and Nextel passes over that information.

And, again, the same sort of testimony will be given, a detective testifying, information given to him by someone else, and then he's gonna testify.

What my main worry is, Your Honor, is that a detective's gonna take the stand and state, at 4:47 a.m., Mr. Wilder's phone was hitting off of this tower in the general location of where the shooting took place.

On cross examination I'm not gonna be able to get into anything 'cause he's not an expert on this.

He's gonna testify to what the tower information is, and I think it needs to come in through an expert who can testify to where the towers are located, how close the towers are, how a phone pings off a certain tower compared to one two miles away, all this information that would come out, and I don't think a detective—unless [the prosecutor] says this detective has that kind of expertise, and I don't think he does.

It's twofold: The hearsay aspect of it; and I think this needs to come in through an expert witness, even the Baltimore County Police Department, or someone from Nextel.

THE COURT: All right. [Prosecutor]?

[PROSECUTOR]: Thank you, Your Honor. Respectfully, Detective Hanna is not going to—

\* \* \*

He is not going to render any opinion whatsoever, neither expert nor lay nor otherwise.

\* \* \*

Detective Hanna will testify that he developed a suspect, he investigated, he had reason to believe that the suspect was at a certain location. He did surveillance on that location and, sure enough, the defendant came out, and he was placed under arrest.

In the second part, the part that pertains to this exhibit that [defense counsel] referred to, all Detective Hanna did was obtain certified cellular phone records from Sprint Nextel.

Those certified records show inbound calls, outbound calls, the duration of the call. They show the date that the call was made, they show the originating number, they show the number the call was placed to or came from, and they also show a code that corresponds to longitude and latitude, coordinates that can be plotted on a map to show cell tower locations.

And Detective Hanna took the information from the certified cell phone records and he plotted the towers on a map of the relevant area of Baltimore County, and the certified records show that the calls in question utilized those particular towers.

THE COURT: All right. So these are records that are certified in what way?

[PROSECUTOR]: Certified from Sprint Nextel as business records.

THE COURT: Okay. So he's taken certified business records. So if they have the proper certification,—which [defense counsel] may look at—those records would come into evidence.

[PROSECUTOR]: Yes, Your Honor.

[DEFENSE COUNSEL]: And I'm not contesting that the records are not certified, Your Honor.

[PROSECUTOR]: I will let the Court know that Detective Hanna is, in fact, not an expert. And I am not attempting to qualify him as such, but he was able to do this just using the certified records.

All he did was look at the records and plot out the towers and the calls that correspond to the towers using just the information from the records, and that's all he's going to testify about with regard to this particular issue.

THE COURT: No, I understand.

We've had that type of testimony before. We have not had that testimony presented in this way before.

[Defense counsel], is there anything else you wish to say?

[DEFENSE COUNSEL]: If you don't mind, Your Honor. I understand the State—I didn't know they weren't going to try to get in how they followed him. So I guess if they're not gonna put in testimony how they got to him then that becomes moot.

But my worry, as I said, Your Honor, is that a detective's gonna testify. He's not gonna be able to answer any of my questions that I would normally put to an expert.

And I know the logical conclusion of that is that I should call an expert in rebuttal, but that puts me in a position where they're gonna proffer testimony that this detective can't—he can't explain anything about this, Your Honor.

This is a highly technical situation where they are claiming that my client is in the general location. I need to know how big of a tower area this is. I don't know if he knows the answer to that. I don't know if he knows what the next closest tower is, Your Honor.

I'm not saying he's an expert, but I'm saying it should come in through an expert.

I mean, this is highly—I mean, the evidence that they're gonna put in is that he is—his cell phone is in the area at the time of the shooting. I mean, that's an extremely large part of the State's case in this case, because there's no eyewitness to him actually doing it.

They're gonna say, cell phone. And if I don't have the ability to do any cross examination on that because their detective's gonna say, I don't know, I don't know, then I'm left with nothing, Your Honor.

THE COURT: Well, I'm not left with much on this record to rule at this time.

Your argument is too sketchy for me at this time.

\* \* \*

He's taking some records that are certified and he is plotting some points on them. He's not going to express any opinions after he's plotted those points.

[DEFENSE COUNSEL]: I would assume, and I don't want—maybe assuming's a bad thing. He's gonna have to express some sort of an opinion that the cell phone was in this area.

THE COURT: No. She said he's not going [sic] express any opinions.

[DEFENSE COUNSEL]: All right.

THE COURT: And, in fact, since he's not being called as an expert and not being qualified as such, he wouldn't be able to ex—

[DEFENSE COUNSEL]: Okay.

THE COURT:—to express that opinion.

[DEFENSE COUNSEL]: I guess we'll have to wait to see how he testifies.

THE COURT: Right. I mean, it sounds like the records—there's—if there's a proper certification on them, they would be admitted into evidence. And he's taken those records which are certified and made up some map from them. But there are no opinions.

[DEFENSE COUNSEL]: Okay.

THE COURT: That's what we're hearing.

* * *

THE COURT: All right. So that defense motion at this point is—it's not granted at this time.

Initially, when Hanna testified that police obtained Wilder's cell phone numbers, and that this information was useful for "finding out a lot about a person through GPS or cell tower hits[,]" there was no objection. Counsel did object, however, when Hanna recounted that he confronted Wilder with the fact that "cellular telephone records" provided information that contradicted Wilder's version of events. When Hanna described using software to produce a map that depicted locations of cell phone calls, defense counsel objected again, citing a lack of foundation. Later, when the State moved to admit State's Exhibit 29, described as a "very enlarged print-out of the map," the cell phone calls, "tower hits," and other information, counsel objected, without providing a basis. The trial court admitted the exhibit, and no further objections were made when Hanna described in detail what the map portrayed.

■ We briefly address the State's waiver argument. The State asserts that Wilder's appellate argument differs from that raised before the trial court. The Court of Appeals has emphasized that

> the general rule in Maryland [is] that "where a party makes a motion *in limine* to exclude irrelevant or otherwise inadmissible evidence, and that evidence is subsequently admitted, the party who made the motion ordinarily must object at the time the evidence is actually offered to preserve [its] objection for appellate review."

*Brown v. State,* 373 Md. 234, 242, 817 A.2d 241 (2003) (quoting *Reed v. State,* 353 Md. 628, 637, 728 A.2d 195 (1999)).

■ A timely general objection may satisfy this requirement. We believe that Wilder's challenge to Hanna's testimony has not been waived. First, after objecting on hearsay grounds, defense counsel made a general objection when Hanna mentioned using cell phone records and cell tower hits

during his interrogation of Wilder. Defense counsel also made a timely contemporaneous objection to the admission of the evidence that was created by Hanna based on the cell phone records. Hanna's subsequent testimony reflected his work on the "map," the admission of which was subject to counsel's objection.

We also conclude that, while Wilder offered specific bases for his objection to Hanna's testimony, both in argument on the motion *in limine,* and after portions of Hanna's testimony, his objection to the admission of the map, and Hanna's accompanying testimony, (State's Exhibit 29), constitutes a general objection. Recently, Judge Murphy pointed out for the Court of Appeals:

> The record also shows that Petitioner's trial counsel interposed a timely *general* objection to Officer Tucker's opinion. Under Md. Rule 4–323(a), the Circuit Court could have directed that Petitioner's trial counsel state the grounds for the objection. The Circuit Court, however, overruled the objection without directing that the grounds for the objection be stated. In *DeLeon v. State,* 407 Md. 16, 962 A.2d 383 (2008), this Court reaffirmed the well settled principle that "party basing an appeal on a 'general' objection to admission of certain evidence, may argue any ground against its inadmissibility. *Boyd v. State,* 399 Md. 457, 475–76, 924 A.2d 1112, 1122–23 (2007)." *Id.* at 24–25, 962 A.2d at 387 (emphasis in original). Under these circumstances, Petitioner's present argument was not waived.

*Johnson v. State,* 408 Md. 204, 223, 969 A.2d 262 (2009).

The Court of Appeals has emphasized that the " 'effect of a general objection in this State is far-reaching. . . . We have said that when the trial court does not request a statement of the grounds for an objection, a general objection is sufficient to preserve all grounds which may exist.' " *Boyd v. State,* 399 Md. 457, 476, 924 A.2d 1112 (2007) (quoting *Ali v. State,* 314 Md. 295, 305–306, 550 A.2d 925 (1988)). We shall therefore address Wilder's challenge to the admission of cell phone location evidence and testimony.

Hanna testified that, once the police suspected Wilder, they sought to obtain his cell phone records. Hanna explained the facility of using the records and derivative methods of charting location:

> Because we've used it many other times. It's a successful tool in locating or finding a lot about a person through GPS or cell tower hits and just ... who they know, who they talk to, the times of day they talk to them, all kinds of different—
>
> You can get a lot out of a cell phone record and a cell phone signal that's actually comin' off of it.

\* \* \*

Q. Now, when you say you have used this investigative technique before, can you say how many times in your duties as a law enforcement officer you have used that technique?

A. Just approximately 25. It may be more, it may be less.

Q. Okay. So once you obtained the cell phone numbers, what—what did you do next with regard to the cell phone numbers?

\* \* \*

Q. All right. And what, if any, certification did you have for those cell phone records?

A. Certification came from the cell phone company[.]

Hanna then explained how he used the cell phone records to create a map of call locations from Wilder's cell phone records.

Q. Now, Detective, when you got the cell phone records, what—and I'm talking about after—not—not anything in terms of locating the defendant.

A. Um-hmm.

Q. But what, if anything, did you do with the records otherwise?

A. . . . And then the time even after we located him, after we—after I even did the interview and all, I tried to figure

it all out and piece it all together and came up with, basically, the tower locations generally, who was trying to—or at least addresses of people who were either calling him or he was calling or that the phone was calling.

And I also at some point put together a map using Microsoft Streets and Trips and just tried to map out for my—for myself to see where these—these towers were hitting off of and to see kind of when and—when, where, and how that all came together usin' the cell phone records that were provided.

Q. Okay. What is Microsoft Streets and Trips?

A. It's just a Microsoft program that we just happen to use for a lot of our Investigations to do a lot of mapping. It's—it's pretty user friendly as far as allowin' you to map latitude and longitude on the map without really knowing where the latitude and longitude may be.

It allows you to map addresses, and it allows you to label things and kind of manipulate it for presentation or maybe some other type of use.

We only use it for, obviously, puttin' together maps and just kinda givin' people an idea of where this stuff is that we're talkin' about.

\* \* \*

[PROSECUTOR]: Detective, I'm going to show you what's been entered into evidence already as State's Exhibit 23. And if you could, please—

Well, what is State's Exhibit's 23?

A. It's the cell phone records provided by Sprint Nextel Corporation.

Q. Okay. Can you please explain to the jury what information is on this particular page of the records, the first page?

A. Okay. Well, they're kinda coded at the top. Some of them don't make a whole lot of sense. But the first column is actually the target number, or in this case one of the cell phones he was using.

* * *

A. The second column is the date of when the call took place.

The third column—third column is the call initiation time, or when the call started.

The fourth column is the duration of the call in seconds. That actually will pick up—whether someone picks up the phone or not, it still records from the time you hit the talk button on your cell phone.

The type of call is the next column. It just simply says inbound or outbound, meaning outbound meaning he made—or the person using this phone made the call, and inbound meaning somebody called the phone.

* * *

And then the following two columns are the coded originating and terminating cellular phone tower sites. It starts with originating and ending and terminating. Those columns sometimes have the same exact information in them and other times they—the 24 towers will be different in each column.

Q. Okay. And the—what is it that actually appears in these two columns, originating cell site and terminating cell site? What is all of that—what are all of those letters and numbers?

A. It's basically the code—for whatever reason, they decide to use a code of some sort at Nextel Sprint that doesn't mean anything to anybody unless you have—unless you ask them or you look at a spreadsheet of what this code means.

And it basically correlates to latitude/longitude, and they even actually sometimes label a cell site tower with an address and things like that.

Q. Okay. Do you have access to the spreadsheet that converts these codes to longitude and latitude?

A. Yes.

Q. Okay. And if you have that, what can you do?

A. Well, once I figure out that this code means a certain latitude/longitude then I just simply—using that Microsoft Streets and Trips program, you search for that latitude/longitude, and it pinpoints it on the map.

Q. Okay. And did you do that in this case?

A. Yes.

Q. And did you create a map?

A. Yes, I did.

At this point, defense counsel objected, citing the lack of a proper foundation for the map because it was derived from records that had not been certified. Following a discussion at the bench, questioning resumed.

THE COURT: All right. There was an objection but there was no pending question.

[PROSECUTOR]: Detective, you just testified that you created a map.

A. Yes.

Q. And to create that map you used records that you received when?

A. The day of the crime, July 25th.

Q. Okay. Have you since that time had an opportunity to view a certified copy of these same records?

A. Yes.

Q. And, in fact, were you able to view the certified copy that has been already entered into evidence as State's Exhibit Number—

THE CLERK: 22 and 23.

[PROSECUTOR]:—22 and 23?

A. Yes.

Q. And from looking at those, were you able to make any determination as to whether or not the information you had in July of 2007 that you used to create the map is the same as the information that is contained in the certified records entered into evidence today?

A. Yes. It matched exactly.

Q. Okay. Thank you.

I'll show you, Detective, what has been marked as State's Exhibit Number 29. What is State's Exhibit 29?

A. That is a very enlarged printout of the map that I created on my laptop usin' Microsoft Streets and Trips.

Q. Okay. And would you be able to, step by step, explain exactly how you created this map?

A. Yes.

Q. Okay. Go ahead.

A. Okay. Well, basically, like I said before, after getting the longitude and latitude for every originating and terminating cell cite tower, I would use those longitudes and latitudes to find a—find the locations on the map.

I also correlated that with the phone call—or the phone number associated with that tower hit; the direction of the call, meaning the outbound or inbound; the time of the call; and the duration of the call in seconds. All that information's on the map. The map's also numbered in chronological order from the time I have the first bit of information, which I believe starts at 4:29 a.m. on July 25th, and ends on the same date at 5:55 a.m.

Basically, the numbers—all the numbers on the map are tower hits other than Number 5 and 12; 5 is the location of the shooting and the time—the approximate time it occurred, and Number 12 is the location of where Aubrey, the defendant, was arrested.

So I just chronologically made a—basically, a time line on a map showing when the shooting occurred, the calls surrounding that shooting, and the locations of where the towers are hitting off of those calls.

Q. Okay. And the numbers that appear in these white boxes, were they obtained from the cell phone records?

A. Yes.

Q. And did you have an opportunity to view these locations actually in real life to verify that the cellular phone towers are where they appear to be on this map?

A. Yes, I did.

Q. Okay. And you checked everyone?

A. Yes.

[PROSECUTOR]: State's going to move to admit 29.

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: All right. Exhibit 29 will be admitted.

 Maryland Rule 5–702 governs expert testimony, and provides in relevant part: "Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." Md. Rule 5–702.[12] *See* 6 L. McLain, MARYLAND EVIDENCE § 702:3 at 734–35 (2001 & 2009 Supp.). "[E]xpert testimony is admissible only if it is relevant," and "such evidence is relevant if the jury will find the testimony helpful in resolving the issues in the case." *Bomas v. State,* 181 Md.App. 204, 208, 956 A.2d 215 (2008) (citations and internal quotation marks omitted), *aff'd on other grounds,* 412 Md. 392, 987 A.2d 98 (2010).[13]

Wilder asserts, in the words of his brief, that

[t]he admission of Detective Hanna's testimony directly contradicts the holding of *Ragland v. State,* 385 Md. 706, 870 A.2d 609 (2005). In *Ragland,* the Court of Appeals held that "Md. Rules 5–701 and 5–702 prohibit the admission of "lay opinion" testimony based upon specialized knowledge,

---

12. Maryland Rule 5–702 provides:

Rule 5–702. Testimony by experts.

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

13. Appellant does not complain of a failure of discovery. *Compare Hutchinson v. State,* 406 Md. 219, 226–27, 958 A.2d 284 (2008) (holding State's violation of discovery rule on experts in effect at the time of trial not harmless error). *See* Md. Rule 4–263(b)(4)(2006).

skill, experience, training, or education." An expert from the cell phone company or an engineer familiar with cell phone technology would have been the proper person to testify as to those matters.

Ragland was convicted of distribution of cocaine. Among the State's witnesses were two police officers who opined, over objections, that, based on their observations, Ragland had been engaged in a drug transaction. Neither officer had been proffered or qualified as an expert witness.

On appeal, Ragland asserted that the testimony of the officers characterizing the transaction they observed as a "drug transaction" was expert testimony. He claimed that the trial court erred in admitting this testimony because neither officer had been identified as an expert in the State's required discovery, and also because the State failed to qualify them as experts at trial. The Court of Appeals agreed with Ragland, and ruled that the opinion testimony of those officers was expert testimony, given the nature of their conclusions. Such testimony was inadmissible because the discovery and evidentiary predicates had not been satisfied.

Examining relevant conflicting authority in light of the amendments to the Federal Rules of Evidence that became effective in 2000, the Court concluded:

We think the better view in interpreting the rule regarding opinion testimony is the more narrow one, and the view as expressed in the amended Fed.R.Evid. 701. We also agree with the Court of Appeals for the Fourth Circuit and those courts that have found that by permitting testimony based on specialized knowledge, education, or skill under rules similar to Md. Rule 5–701, parties may avoid the notice and discovery requirements of our rules and blur the distinction between the two rules. Accordingly, we will follow the approach as reflected in the 2000 amendment to Fed.R.Evid. 701 and hold that Md. Rule 5–701 and 5–702 prohibit the admission as "lay opinion" of testimony based upon specialized knowledge, skill, experience, training or education.

385 Md. at 725, 870 A.2d 609(footnote omitted). The Court concluded that the "approach as reflected in the 2000 amendment to Fed.R.Evid. 701" offered an appropriately narrow interpretation of the rule, which would preserve the distinction between lay and expert opinion testimony. Indeed, the Federal Rule

> [had] been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing. Under the amendment, a witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702. *See generally Asplundh Mfg. Div. v. Benton Harbor Eng'g,* 57 F.3d 1190 (3d Cir.1995). By channeling testimony that is actually expert testimony to Rule 702, the amendment also ensures that a party will not evade the expert witness disclosure requirements set forth in Fed.R.Civ.P. 26 and Fed.R.Crim.P. 16 by simply calling an expert witness in the guise of a layperson. *See* Joseph, *Emerging Expert Issues Under the 1993 Disclosure Amendments to the Federal Rules of Civil Procedure,* 164 F.R.D. 97, 108 (1996) (noting that "there is no good reason to allow what is essentially surprise expert testimony", and that "the Court should be vigilant to preclude manipulative conduct designed to thwart the expert disclosure and discovery process"). *See also United States v. Figueroa–Lopez,* 125 F.3d 1241, 1246 (9th Cir.1997) (law enforcement agents testifying that the defendant's conduct was consistent with that of a drug trafficker could not testify as lay witnesses; to permit such testimony under Rule 701 "subverts the requirements of Federal Rule of Criminal Procedure 16(a)(1)(E)").

Federal Judicial Conference, Committee on Rules of Practice and Procedure, *Report of the Advisory Committee on Evidence Rules (Committee Note to Rule 701)* at 26–27 (1999), *reprinted in* Court Rules: Amendments to Federal Rules of

Evidence (Committee Note to Rule 701), 192 F.R.D. 340, 416–17 (2000).

Although we shall hold that the use of cell phone site location evidence and the accompanying testimony of a law enforcement officer who explained its use require the qualification of the sponsoring witness as an expert, we recognize authority permitting the lay testimony of a police officer with respect to cell site location. In *Perez v. State*, 980 So.2d 1126 (Fla.App.3d Dist.), *rev. denied*, 994 So.2d 305 (Fla.2008), *cert. denied*, 556 U.S. ——, 129 S.Ct. 1618, 173 L.Ed.2d 1003 (2009), the defendant asserted that the trial court abused its discretion by permitting custodians of cellular telephone records to testify about the relative locations of cell phone callers and the cell phone tower that was identified with those calls. Perez contended that such testimony was beyond the expertise of the records custodians. The Florida court rejected that argument:

> We find that the testimony of … the records custodians from Sprint–Nextel and Metro PCS, did not constitute expert testimony under section 90.702, Florida Statutes (2007), and therefore was properly admitted. As in *Gordon v. State*, 863 So.2d 1215, 1219 (Fla.2003), the record demonstrates that Plasmir "simply factually explained the contents of phone records." As in *Gordon*, the custodians factually compared the locations on the phone records to locations on the cell site maps. Plasmir testified that a typical cell site covered an area of one to three miles. She then stated that the record for a particular cell phone details the actual cell tower off of which the call bounces. This testimony constituted general background information interpreting the cell phone records which did not require expert testimony. It did not reveal the precise location within that one to three mile radius from which the calls were generated. It only served to explain the concept of a cell site and how it generally related to cellular telephone company records. Moreover, there was no direct evidence presented by the defendant to dispute these generalized facts or question their validity. *Compare United States v. Sepulveda*, 115

F.3d 882 (11th Cir.1997) (holding that scientific cell site analysis is necessary to determine liability for unauthorized use of cellular air time). A juror's own knowledge, experience and familiarity with the addresses of the receiving cell towers themselves as shown on the site map coupled with the familiarity of the location of the origin of the calls were sufficient for each juror to determine the location of the tower without the need for expert testimony. *See McGough v. State*, 302 So.2d 751 (Fla.1974). Therefore, the trial court did not abuse its discretion in overruling the defendant's objections and denying the defendant's motion for mistrial where the cell phone records and accompanying testimony were properly introduced.

*Perez*, 980 So.2d at 1131–1132.

■■■ Taking into account the narrow approach of *Ragland*, we believe that the better approach is to require the prosecution to offer expert testimony to explain the functions of cell phone towers, derivative tracking, and the techniques of locating and/or plotting the origins of cell phone calls using cell phone records. Other jurisdictions have adopted that procedure. In *Wilson v. State*, 195 S.W.3d 193 (Tex.App.-San Antonio-2006, no pet)., the defendant contested the trial court's admission of the testimony of a Sprint employee, claiming that she was not qualified. The Texas appellate court rejected this challenge, and its description of the witness's credentials and experience merits our review:

The State called Sprint employee Danko as the custodian of Wilson's cellular phone records to lay the appropriate predicate under the business records exception to the hearsay rule. TEX.R. EVID. 803(6). The records were admitted, but in addition to being the custodian of the records, the State also sought Danko's opinions as an expert regarding the interpretation of those records based on her training and experience. Danko explained that the signal from a cellular phone is transmitted from cellular towers, usually transmitting from the tower closest to the person placing the phone call. If the individual is moving, the signal may be pulled from a different tower. The phone records denote

the first tower accessed when the call began and the last tower utilized when the call ended. Each tower has a general range of up to three miles, with three different sectors showing the direction of the call.

Danko explained that the location of the cellular towers and Wilson's cellular phone records reflect a map of Wilson's movements

\* \* \*

Danko's training and experience allowed her to understand and interpret the computer generated records. The trial court determined Danko possessed "specialized knowledge which the court believes could or would assist the trier of facts to understand something that is in issue and ... her skill, experience, training and knowledge," would provide assistance to the jury on the point at issue. It is reasonable to conclude, given Danko's background, that her explanation of the reports and the information contained therein, specifically the incoming and outgoing calls, cell tower locations and general technology with regard to tracking cellular calls, would assist the trier of fact to better understand the evidence or to determine a fact in issue. See Tex.R. Evid. 702. The record further supports that officers and emergency vehicles relied on Danko to make similar interpretations on a daily basis. Under this record, the trial court did not abuse its discretion in admitting Danko's testimony.
*Wilson,* 195 S.W.3d at 200–202.[14]

In *State v. Manzella,* 128 S.W.3d 602 (Mo.Ct.App.2004), the defendant appealed from a conviction for first degree murder.

---

14. In *Pullin v. State,* 272 Ga. 747, 534 S.E.2d 69 (2000), the defendant appealed from the trial court's denial of his motion *in limine* by which the defendant sought to "prohibit the prosecution from offering expert testimony based upon an analysis of cellular telephone records to establish ... location[.]" The challenge was to the reliability of the science, a point not questioned in the case before us, and the Georgia Supreme Court ruled that the trial court acted within its discretion in ruling that the technology was reliable. Of interest is the fact that the

The prosecution introduced the defendant's cellular telephone records and produced a "radio frequency performance engineer" from Cingular "to identify [defendant's] location" at the time he placed a cell call on the morning of the crime. The defendant sought to rebut the expert's testimony through his own personal "knowledge regarding cellular towers." *Manzella*, 128 S.W.3d at 608–09. The trial court permitted the defendant to "testify about certain aspects of his cellular bill, such as telephone calls made and received and charges." *Id.* But, the trial court refused to permit the defendant to offer rebuttal testimony because the defendant "was not qualified to discuss the portion of the record referring to cellular towers." *Id.* The Missouri intermediate appellate court affirmed the trial court's exclusion of this testimony, concluding, as did the trial court, that "[d]efendant did not demonstrate how his experiences as a Cingular customer qualified him to testify about cellular towers." *Id.*

We recognize that cellular telephone technology has become generally understood. *See e.g., Pullin v. State*, 272 Ga. 747, 534 S.E.2d 69, 71 (2000) (noting expert opinion that "basic properties of cellular technology are well understood" and judicial acceptance of "basic principles of cellular technology"). Moreover, the use of telephone company cell phone records for investigative purposes has been noted in Maryland cases. *See, e.g., Whiting v. State*, 389 Md. 334, 338, 885 A.2d 785 (2005) (police traced calls using subpoenaed records of victim's cell phone); *Pantazes v. State*, 141 Md.App. 422, 435, 785 A.2d 865 (2001) (records suggested that call from victim's phone to defendant's phone not made from victim's house), *cert. denied*, 368 Md. 241, 792 A.2d 1178 (2002). *Cf. Ragland v. State*, *supra*, 385 Md. at 710, 870 A.2d 609 (police used cell phone records to confirm calls made from pay telephones under surveillance); *Triggs v. State*, 382 Md. 27, 30 n. 1 & 32 n. 2, 852 A.2d 114 (2004) (use of records to establish number of calls made to victim). It may well be that information in a

---

prosecution had produced *six* experts to testify about cell phone technology.

cellular phone record about when a call was placed, and whether it was from or to the subscriber's cell phone, could readily be discerned by a juror familiar with his or her own cell phone bill. But, as Professor McLain has pointed out, "[n]o longer need the subject matter be so far 'beyond the ken of laymen' that the finder of fact could not have any understanding of the particular issue without expert help." McLain, *supra*, MARYLAND EVIDENCE § 702:3 at 735–36 (footnotes omitted).

In the case before us, Hanna's testimony implicated much more than mere telephone bills. He elaborated on the information provided by the cell phone records—the bills and records of calls—by his use of a Microsoft software program to plot location data on a map and to convert information from the cellular phone records in order to plot the locations from which Wilder used his cell phone. This procedure clearly required "some specialized knowledge or skill ... that is not in the possession of the jurors[.]" *Ragland*, 385 Md. at 720, 870 A.2d 609 (citation and internal quotation marks omitted).

Following *Ragland*, the Court of Appeals has reiterated that "opinions based on a witness's 'training and experience ... should only [be] admitted as expert testimony, subject to the accompanying qualifications and discovery procedures.'" *Johnson*, 408 Md. at 225, 969 A.2d 262 (quoting *Ragland*, 385 Md. at 709, 870 A.2d 609). Hanna's description of the procedures he employed to plot the map of Wilder's cell phone hits was not commonplace. Because his explanation of the method he employed to translate the cell phone records into locations is demonstrably based on his training and experience, we conclude that he should have been qualified as an expert under Md. Rule 5–702, and that the State was obliged to fulfill its discovery obligations under Md. Rule 4–263(b)(4)(2006). The trial court ought not have permitted Hanna to offer lay opinion testimony about the cell site location, and to describe the map created based on the cellular telephone records.

As we have concluded, the error in the admission of Hanna's testimony was not harmless beyond a reasonable doubt.

■　The Court of Appeals has articulated the standard for harmless error in *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976).　In cases of established error, that error will be deemed harmless if a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict.　*See id.* at 659, 350 A.2d 665.　*See Washington v. State,* 406 Md. 642, 656, 961 A.2d 1110 (2008) (citations omitted).　We cannot so declare.

■　We cannot say, based upon our independent review of the record, that the error in the admission of Hanna's opinion testimony, did not contribute to the verdict in this case.　The evidence was used for the sole purpose of placing Wilder at or near the scene of the shootings at the Williams residence. That, we believe, is compelling.

### 4.　*The Juror Who Was Not Excused*

We conclude that this issue has been waived.　But, in any event, it is not likely to recur at a retrial.　Hence, we need not address the question.

**JUDGMENT OF CONVICTION FOR USE OF A HANDGUN REVERSED; JUDGMENTS OF CONVICTION ON REMAINING COUNTS VACATED; CASE RETURNED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR A NEW TRIAL.**

**COSTS ASSESSED TO BALTIMORE COUNTY.**